Sharon D. BRINKLEY–OBU,
Plaintiff–Appellee,

v.

HUGHES TRAINING, INCORPORATED,
Defendant–Appellant.

Sharon D. BRINKLEY–OBU,
Plaintiff–Appellant,

v.

HUGHES TRAINING, INCORPORATED,
Defendant–Appellee.

Nos. 93–1760, 93–1898.

United States Court of Appeals,
Fourth Circuit.

Argued Feb. 10, 1994.

Decided Sept. 26, 1994.

**ARGUED:** Christine Hope Perdue, Hunton & Williams, Fairfax, VA, for appellant. James Harold Heller, Kator, Scott & Heller, Washington, DC, for appellee. **ON BRIEF:** David A. Walsh, Hunton & Williams, Fairfax, VA, for appellant. Philip J. Simon, Kator, Scott & Heller, Washington, DC, for appellee.

Before MURNAGHAN and NIEMEYER, Circuit Judges, and YOUNG, Senior United States District Judge for the District of Maryland, sitting by designation.

Affirmed by published opinion. Judge MURNAGHAN wrote the opinion, in which Judge NIEMEYER and Senior Judge YOUNG joined.

### OPINION

MURNAGHAN, Circuit Judge:

Sharon Brinkley–Obu brought Equal Pay Act and Title VII claims against her employer, Hughes Training Inc. (HTI) in October 1992. On April 21, 1993, the jury returned a verdict in favor of Brinkley–Obu finding that HTI had committed a non-willful violation of the Equal Pay Act of 1963, 29 U.S.C. § 206(d) (1988), and awarded Brinkley–Obu $27,639.00 in back pay. The jury also found that HTI had violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, with respect to one of Brinkley–Obu's former

co-workers, William Turner. Instructed to award compensatory damages only for those acts committed after the effective date of the Civil Rights Act of 1991, the jury awarded Brinkley–Obu $10,000 for the Title VII violation.

On June 22, 1993, the district court denied HTI's motion for judgment as a matter of law, entering judgment for Brinkley–Obu on both the Equal Pay Act and the Title VII claims in the amounts awarded by the jury. HTI has appealed that judgment. Brinkley–Obu has appealed from the district court's judgment denying her liquidated damages under the Equal Pay Act entered on June 22, 1993, and from a subsequent order denying her equitable relief pursuant to Title VII.[1] We affirm the district court's judgment throughout, upholding the jury verdict in favor of Brinkley–Obu as well as the district court's denial of liquidated damages and equitable relief.

### Background

Hughes Aircraft Company acquired Honeywell's flight simulation division in 1989 and, subsequently, formed a subsidiary, HTI. HTI operates a facility in Herndon, Virginia where it designs and manufactures flight simulation systems for United States military aircraft. In April 1987, Brinkley–Obu began work with HTI's predecessor, Honeywell, as a contractor with duties in the quality assurance area. In July of that year, she was hired as a full-time employee by the director of the Product Assurance Department, Ronald Smith. The Product Assurance Department is responsible for the inspection, testing, and auditing of HTI's flight simulators to guarantee that quality standards are being met and to monitor compliance with contract specifications and Department of Defense regulations. The Product Assurance Department contains the following management functions: Quality Assurance (Hardware and Software)[2]; Configuration Management; Quality Control; and Systems Test.

Brinkley–Obu entered the company as a grade level E–2 Quality Engineer making $38,000 a year when she was 31 years old.[3] Trial testimony established that she was qualified to come in as an E–4 or E–5 level engineer based on her educational background and seven years of relevant experience. She submitted a request for a starting salary of $42,000 which Smith, the person hiring her, denied.[4] During her tenure at

1. In an Order dated July 6, 1993, the district court awarded Brinkley–Obu prejudgment interest on her backpay award and raised the total attorney's fee award to $99,467.00. The court noted that the defendant, if unsuccessful on appeal, would be required, upon the exhaustion of the appeals process, to pay the full amount of judgment against HTI as well as post-judgment interest at the statutory rate within fifteen working days. In addition, the court struck its previous grant of equitable relief in the form of an increase in salary with commensurate benefits effective May 1, 1993 "due to a lack of evidence in the record that would allow the Court to equitably determine the amount necessary to bring Plaintiff to the level of the average male salary earned at her level."

2. At times, the Hardware and Software functions have been discrete, and the managerial positions have been held by different people. Currently, Brinkley–Obu does both of those jobs under the title "Hardware and Software Quality Assurance Manager."

3. HTI has a salary system in which employees may progress both vertically and horizontally. Employees are assigned a job grade when they join the company. Brinkley–Obu's job grades at HTI have included:

Quality Engineer, Administrative Supervisor, and Engineering Supervisor. Within the grades there are salary ranges. An E–2 (Quality Engineer Level Two), therefore, may make the same salary as an AS–3 (Administrative Supervisor Level Three) because the salary ranges overlap, but the AS–3 will have a higher salary growth potential due to the higher salary range of the AS–3. Employees also receive merit raises which are based on their performance.

When assessing an initial hire, HTI considers education, experience, the applicant's expectations, and the salaries of comparable HTI employees in order to assign a starting salary. HTI does not have any mechanism for decreasing an employee's salary regardless of demotion.

4. Brinkley–Obu received a B.S. degree in Mechanical Design Technology in 1980. In addition, she had approximately seven years of experience in the technical quality engineering field. The resume she submitted to Honeywell also describes her experience with and knowledge of the military specification regulations required to perform quality assurance analysis. At trial, she testified that Smith rejected her initial salary request of $42,000 despite HTI's acknowledged practice of taking the applicant's salary expectations into account.

HTI, Brinkley–Obu progressed fairly rapidly as far as titles and responsibilities were concerned. In March 1988, Smith made her the "acting" Hardware Quality Assurance Supervisor (HQAS).[5] At that time, her salary was raised to $39,540 although she remained an E–2. In August 1988, Brinkley–Obu became the permanent HQAS; assumed responsibility for Quality Control because the existing Quality Control Supervisor had been laid off; received a $41,904 salary ($3,492 per month); and advanced to the AS–3 job grade. She received $82 above the mid-point for her AS–3 grade.[6]

In October 1988, Brinkley–Obu took approximately four months of maternity leave, planning to return in February 1989. Before she left, the Product Assurance Department hired an engineer named William Turner. Brinkley–Obu hired him as her subordinate, a "Senior Quality Engineer," and Smith instructed her to offer him an initial salary of $44,040 ($3,670 per month) at the E–3 job grade. Brinkley–Obu questioned the fact that she was instructed to offer a potential subordinate engineer a salary that exceeded her own. Smith replied, "I got you cheap." Turner was very qualified for the position. In his mid-fifties, he had extensive experience and an advanced degree. Brinkley–Obu approved of the job offer, though she questioned the salary.

When Brinkley–Obu left for maternity leave on October 24, 1988, Turner assumed her responsibilities as "acting" HQAS in her absence. Before she returned from leave, however, Smith created a managerial position and promoted Turner to "Hardware Quality Assurance Manager" (HQAM) transferring many of Brinkley–Obu's former responsibilities to him. Turner was also put in charge of Quality Control, formerly one of Brinkley–Obu's responsibilities. In February 1989, when Smith created the managerial position for Turner, Smith authorized an $18,000 raise for Turner increasing his salary to $62,040 (approximately a 40.9% increase to $5,167 per month) and elevated him to an "OD" job grade level.

When Brinkley–Obu returned to HTI on February 16, 1989, she was instructed to report to Turner. She was not demoted, nor was her salary decreased despite the fact that many of her responsibilities had been stripped from her position during her maternity leave. She continued to perform her remaining responsibilities despite what she considered to be a somewhat hostile atmosphere. She believed that Smith and Turner wanted to fire her. Testimony at trial by another employee in the department indicated that Turner was keeping a record of every "mistake" Brinkley–Obu made in order to begin to build a case against her. Brinkley–Obu's infant experienced some illness, and Brinkley–Obu's absence to care for her child was held against her. Smith told her that she was going to have to choose between "having a career and being a mama." Although she took some of her vacation leave to accommodate family sickness, she did not over-extend the total leave available to her. Despite the uncomfortable situation in which she found herself, she continued to perform her job satisfactorily.

In June 1989, approximately three months after she returned from maternity leave, Brinkley–Obu made her first formal complaints about her compensation to HTI's Human Resources Manager. She noted the disparities between her salary and Turner's as well as that of a subordinate in her group, David Calvert. She requested an evaluation. In mid–1989, Smith's replacement, Gene Gilliland, responded to Brinkley–Obu's complaints about her salary and saw to it that she received a salary increase to $44,604 and an "OC" job grade (Engineering Supervisor).

In early 1990, Turner was suspended for misconduct. By April 1990 he left the com-

---

5. Appellants have suggested that within HTI's occupational hierarchy, the position of Manager is superior to that of Supervisor. In 1988, however, the position of Hardware Quality Assurance Manager had not yet been created. Smith created a managerial position in 1989 and promoted William Turner into that position when Brinkley–Obu was on maternity leave.

6. In the internal comparison process, the reviewer generates a compensation ratio (CR). A CR of 1.0 indicates that the employee is at the midpoint of her entry range.

pany, and Brinkley–Obu became the Hardware Quality Assurance Manager several weeks later. In July, she received an 11.7% merit increase raising her salary to $49,836. The Quality Control function, previously performed by Turner, did not revert to Brinkley–Obu. Rather, it was assumed by a new hire, Edmond Monseur. In May 1990, Monseur came in as Quality Control Manager at $60,000 at the "OD" level.[7] Monseur, 64 years old at the time of trial, had three years of college training in engineering (he did not receive a degree), and 25 years experience at Vega Precision Laboratories in Vienna, Virginia, some of which time he spent developing the Quality Assurance program for that company. His highest salary at Vega was $50,000 and he was laid off one year after Vega was bought out by another company.

While employed at HTI as Quality Control Manager, Monseur received one pay raise in June 1991 to reach $63,000. In November 1991, he was demoted to Senior Principal Quality Engineer, E–5, due to reorganization, and he has reported directly to Brinkley–Obu since that time. HTI has not reduced his salary despite his reduced responsibilities. In January 1992, two months after Monseur was demoted to Engineer, Ron Tovsen, Gilliland's successor, assigned Brinkley–Obu responsibility for Quality Control management.[8] Meanwhile, early in 1991, Gilliland had consolidated the Hardware and Software ends of the operation and put Brinkley–Obu in charge of both of those managerial responsibilities. In August 1991, Brinkley–Obu was upgraded to an "OD" level and given a pay raise to $54,360 at Gilliland's initiative.

By January 1992, then, Brinkley–Obu was not only the Hardware Quality Assurance Manager in charge of Quality Control, she also had been assigned the responsibility for Software Quality Assurance Management as of April 1991. In January 1992, she was earning $54,360 a year for fulfilling all three managerial responsibilities.

The background of the software quality assurance position illustrates the HTI career of yet another male employee who was paid more than Brinkley–Obu for doing substantially equal work. Jeff Parnes was hired in September 1988 as Software Quality Assurance Manager (SQAM) at $55,860 and an "OE" job grade.[9] Highly qualified in the software area, Parnes held a college degree in math and a Masters degree in operations research and management science. He also had 14 years experience in software quality assurance. Parnes had no experience, however, in the supervisory capacity. His lack of supervisory experience was noted on his hiring form.

One year later, in November 1989, a contractor, Moses Rouse, took over the software responsibilities when Parnes became the Configuration Manager at $60,996. In November 1990, another year later, Parnes again received a raise, bringing him to a $66,300 annual salary. Finally, in November 1991, he was demoted to an E–5 engineering position and stripped of managerial responsibilities, but his salary remained unchanged.[10]

---

**7.** From August 1988 until the end of October 1988, when Brinkley–Obu was performing both HQAS *and* Quality Control supervising eleven people, she was making $41,904 as an AS–3 rather than $60,000 as an "OD."

Brinkley–Obu did not assume Quality Control again until Monseur was demoted in January 1992.

**8.** During the two month interim, the Quality Control function was performed by Tovsen who had replaced Gilliland as Director of Product Assurance in June 1991.

**9.** Parnes rejected HTI's initial offer of $55,020.

**10.** It should be recalled that Brinkley–Obu was fulfilling the positions of both Hardware and Software Quality Assurance Management as of early 1991. At that time she was making $49,-836 at the "OC" level. When Smith promoted Turner to Hardware Quality Assurance Manager, part of his justification for giving Turner an $18,000 raise was that he wanted the position to be an "OD" level position. That rationale did not lead HTI to make Brinkley–Obu an "OD" when she obtained the Hardware managerial position. Granted, she did not immediately assume responsibility for Quality Control. However, even after she took on both Software and Hardware, HTI waited four months to promote her to the "OD" level and raise her salary to $54,360. Still, as of November 1991, she was making more than $10,000 *less* than Parnes who was fulfilling an E–5 engineering position with no supervisory responsibilities. She was also making $1500 less than Parnes had made when he was hired as SQAM. The point is not that HTI should have reduced Parnes' salary. Rather, HTI should have taken steps to make Brinkley–

In summary, immediately prior to the date that she brought the action against HTI, in September 1992, Brinkley–Obu was earning $57,624 as a result of a final 6% merit raise. At that time she was the Hardware and Software Quality Assurance Manager, and she was also in charge of Quality Control. In September 1992, Brinkley–Obu was performing the same job that William Turner had performed as HQAM in charge of Quality Control. While Turner received $62,040 for his work in that position, Brinkley–Obu received $57,624 at the most. (Brinkley–Obu was being paid approximately $4,400 less even though she had additional responsibilities).[11] In September 1992, Brinkley–Obu was performing the same job that Jeffrey Parnes had performed, SQAM. While Parnes was paid $55,860, Brinkley–Obu spent four months performing that job for $49,836 and one year performing that job for $54,360. She finally received $57,624 in September of 1992, but she also had the additional responsibilities of Hardware Quality Assurance and Quality Control, neither of which were performed by Parnes.[12] In September 1992, Brinkley–Obu was also performing the same job that Monseur had performed as "Quality Control Manager." While he received $60,000 and $63,000 for his work in that position, Brinkley–Obu received only $54,360 and later $57,624 even though she had additional responsibilities.

Brinkley–Obu filed her complaint against HTI on October 9, 1992 in the Eastern District of Virginia, Alexandria Division, stating claims under both the Equal Pay Act and Title VII. She identified five male comparators whom she claimed were paid more than she was based on sex: Parnes, Turner, Monseur, Rudy Baker and Calvert. She withdrew her claim as to Calvert prior to the submission of the claims to the jury. The jury found an Equal Pay Act violation in the case of three of the four remaining men: Turner, Parnes and Monseur. The jury concluded that HTI's violation was non-willful and awarded Brinkley–Obu $27,639 in back pay. The jury found a Title VII violation only with respect to Turner and awarded her $10,000 in compensatory damages. The district court denied HTI's motion for judgment as a matter of law, entering judgment for Brinkley–Obu in accordance with the jury verdicts. Citing *Persinger v. Norfolk & Western Ry. Co.*, 920 F.2d 1185, 1189 (4th Cir.1990), the court explained that HTI's motion should not be granted unless the evidence was so clear that reasonable people could reach no other conclusion than the one suggested by the moving party. *Id.* Addressing the merits of HTI's motion, the judge expressly rejected HTI's arguments based on the statute of limitations, the sufficiency of the plaintiff's prima facie case with

Obu's salary commensurate with the numerous responsibilities she was fulfilling, the titles she held, and the salaries of her male peers with whom she was performing substantially similar work.

11. Brinkley–Obu had also performed the Hardware Quality Assurance position that Turner performed, although she had the title of Supervisor rather than Manager, for a mere $41,904. She was in charge of Quality Control before she left for maternity leave in October 1988.

12. "[D]ifferences in skill, effort or responsibility which might be sufficient to justify a finding that two jobs are not equal within the meaning of the EPA if the greater skill, effort, or responsibility has been required of the higher paid sex, do not justify such a finding where the greater skill, effort, or responsibility is required of the lower paid sex." 29 C.F.R. § 1620.14(a). *See also* 29 C.F.R. § 1620.14(b) for an "illustration of the concept." Section 1620.14(b), formerly 29 C.F.R. § 800.122(b), was cited by the Ninth Cir-

cuit in *Hein v. Oregon College of Education*, 718 F.2d 910, 917 (9th Cir.1983). In *Hein*, the court found that one of the plaintiff employees had additional administrative duties that had no counterpart among her male comparator's duties. The court held that the plaintiff's additional responsibilities did not remove her claim from the ambit of the Equal Pay Act, citing the following interpretive regulation:

[W]here employees of opposite sexes are employed in jobs in which the duties they are required to perform and the working conditions are substantially the same, except that an employee of one sex is required to perform some duty or duties involving a higher skill which an employee of the other sex is not required to perform, the fact that the duties are different in this respect is insufficient to remove the jobs from the application of the equal pay standard if it also appears that the employer is paying a lower wage rate to the employee performing the additional duties notwithstanding the additional skill which they involve. 29 C.F.R. § 800.122(b).

respect to Parnes and Monseur, and HTI's affirmative defenses including the "merit" system and the use of factors "other than sex."

Following Baker's retirement from HTI as of January 1993, Brinkley–Obu became the only remaining manager in the Product Assurance Department.

### Equal Pay Act and Title VII

The Equal Pay Act and Title VII are available to plaintiffs who seek to challenge sex-based discrimination in the workplace. The Equal Pay Act prohibits employment discrimination based on sex:

> No employer having employees subject to any provisions of this section shall discriminate ... between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex ... for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex....

29 U.S.C. § 206(d)(1). The equal work standard does not require that compared jobs be identical, only that they be substantially equal. 29 C.F.R. § 1620.13(a).

Title VII provides: "It shall be an unlawful employment practice for an employer (1) ... to discriminate against any individual with respect to [her] compensation ... because of such individual's ... sex...." 42 U.S.C. § 2000e–2(a). Section 2000e–2(h), the equal pay provision of Title VII, permits an "employer to differentiate upon the basis of sex in determining the amount of the wages or compensation paid or to be paid to employees ... if such differentiation is authorized by the provisions of § 206(d) of Title 29 [the Equal Pay Act]."

■ A plaintiff may assert claims based on unequal pay for equal work under both the Equal Pay Act and Title VII. Plaintiffs bringing claims under the Equal Pay Act or Title VII must establish a *prima facie* case of discrimination. Under the Equal Pay Act, the plaintiff must show that an employer has paid different wages to employees of opposite sexes for equal work in jobs which require equal skill, effort and responsibility and which are performed under similar working conditions. *Corning Glass Works v. Brennan,* 417 U.S. 188, 195, 94 S.Ct. 2223, 2228, 41 L.Ed.2d 1 (1974); *Fowler v. Land Management Groupe, Inc.,* 978 F.2d 158, 161 (4th Cir.1992). A plaintiff may make her *prima facie* case by comparing her salary to that of her predecessor or successor. 29 C.F.R. § 1620.13(b)(2), (4), and (5). Under Title VII, a *prima facie* case of sex discrimination requires showing a connection between sex and the adverse employment decision.[13] "The burden of establishing a prima facie case of disparate treatment is not onerous." *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981). The plaintiff may establish a *prima facie* case by demonstrating that she is female, i.e., a member of a protected class, and that the job she occupied was similar to higher paying jobs occupied by males. *Miranda v. B & B Cash Grocery Store, Inc.,* 975 F.2d 1518, 1529 (11th Cir.1992). Under the disparate treatment model of a Title VII action, "there is a relaxed standard of similarity between male and female-occupied jobs, but a plaintiff has the [ultimate] burden of proving an intent to discriminate on the basis of sex." *Id.* at 1526.[14]

---

**13.** Cf. *Autry v. North Carolina Department of Human Resources,* 820 F.2d 1384, 1385 (4th Cir. 1987) (noting that a *prima facie* case of race discrimination under Title VII requires showing a connection between race and the adverse employment decision).

**14.** In *County of Washington v. Gunther,* 452 U.S. 161, 101 S.Ct. 2242, 68 L.Ed.2d 751 (1981), the Supreme Court "determined that failure to prove the equal work standard of the Equal Pay Act did not bar a plaintiff's cause of action under Title VII for discrimination in compensation." *Plemer v. Parsons–Gilbane,* 713 F.2d 1127, 1131 (5th Cir.1983).

After the plaintiff establishes a *prima facie* case under the Equal Pay Act or Title VII, the burden shifts to the defendant to offer a legitimate reason for the apparent discrimination. The allocation of the burdens of proof for claims brought under Title VII and the Equal Pay Act differ significantly. Under the Equal Pay Act, the plaintiff creates a presumption of discrimination when she establishes a *prima facie* case. The burden of production *and* persuasion then shift to the defendant "to show, by a preponderance of the evidence, that the wage differential resulted from one of the allowable causes enumerated by the statute." *Fowler v. Land Management Groupe*, 978 F.2d 158, 161 (4th Cir.1992). The defendant must prove one of four affirmative defenses to avoid liability. 29 U.S.C. § 206(d)(1). A persuasive demonstration that the wage differential was caused by "any other factor other than sex," if accepted by the jury, would allow the defendant to avoid liability.

29 U.S.C. § 206(d)(1)(iv). If the defendant does not establish such a defense, the jury must return a verdict in favor of the plaintiff.[15] In Title VII cases, by contrast, the plaintiff's *prima facie* case serves to shift only the burden of production to the defendant.[16] Once the defendant offers a nondiscriminatory justification for the wage differential, the burden of persuasion remains on the plaintiff to demonstrate that the proffered explanation is pretextual and that the defendant was actually motivated by discriminatory intent.[17] *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 1093–94, 67 L.Ed.2d 207 (1981). The plaintiff may make the required showing "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Plemer v. Parsons–Gilbane*, 713 F.2d 1127, 1136 (5th Cir.1983).[18]

15. The plaintiff is not required, in the context of an Equal Pay Act claim, to adduce direct evidence of sex discrimination above and beyond the *prima facie* case. *Fowler*, 978 F.2d at 161–62.

16. Under *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 255 n. 8, 101 S.Ct. 1089, 1094 n. 8, 67 L.Ed.2d 207 (1981), in a Title VII case, "the allocation of burdens and the creation of a presumption by the establishment of a prima facie case is intended *progressively* to sharpen the inquiry into the elusive factual question of intentional discrimination." *Id.* (emphasis added).

17. Due to the different allocation of burdens, a plaintiff may succeed on an Equal Pay Act claim and fail to establish a Title VII claim. "It is possible that a plaintiff could fail to meet its burden of proving a Title VII violation, and at the same time the employer could fail to carry its burden of proving an affirmative defense under the Equal Pay Act." *Fallon v. Illinois*, 882 F.2d 1206, 1217 (7th Cir.1989). In support of its statement of the law, the *Fallon* court cited our decision in *Brewster v. Barnes*, 788 F.2d 985, 991–92 (4th Cir.1986). In *Brewster*, we held that the defendants had violated the Equal Pay Act with respect to Brewster who qualified as an "employee" under the Equal Pay Act. The district court in that case concluded that Brewster had failed to meet her ultimate burden of proving that the defendants intentionally discriminated against her because of her sex. We did not find the district court's conclusion clearly erroneous, and we explicitly noted that "[t]he finding that

the defendants did not intentionally discriminate against Brewster because of her sex is not inconsistent with the previous finding that the defendant violated the Equal Pay Act." *Brewster*, 788 F.2d at 993 n. 13. The district court's finding meant that the defendants did not intend to discriminate, and discriminatory intent is not an element of an Equal Pay Act claim. *Id.*

18. Under *St. Mary's Honor Center v. Hicks*, —— U.S. ——, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993), the jury's rejection of the employer's proffered reasons for its actions in a Title VII case does not entitle the plaintiff to judgment as a matter of law. The plaintiff has the burden of persuading the jury that the defendant intentionally discriminated against her because of her sex. In other words, it is conceivable that a jury might find the defendant's reasons for taking a certain action with respect to the plaintiff pretextual without also finding that the action constituted intentional discrimination. In *St. Mary's Honor Center*, Justice Scalia wrote, "[t]he factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination. Thus, rejection of the defendant's proffered reasons, will *permit* the trier of fact to infer the ultimate fact of intentional discrimination." *Id.* at ——, 113 S.Ct. at 2749 (emphasis in original). No additional proof of discrimination is required. *Id.*

"Because the plaintiff frequently finds it an impossible or most difficult task to produce direct evidence of an employer's intent to discrimi-

In the instant case, the jury found for Brinkley–Obu on her Equal Pay Act claim with respect to three men employed by HTI, and on her Title VII claim with respect to only one of those men. HTI has asserted that Brinkley–Obu failed to prove that she performed equal work for purposes of the Equal Pay Act. In addition, HTI has argued that Brinkley–Obu did not present sufficient evidence of discriminatory intent to justify a Title VII verdict. As noted above, however, the plaintiff may satisfy her burden of persuasion in a Title VII case either directly or indirectly. *Plemer*, 713 F.2d at 1136. In the instant case, Brinkley–Obu established a *prima facie* case under the Equal Pay Act and Title VII and produced evidence that allowed the jury to discredit, for Equal Pay Act and Title VII purposes, HTI's proffered explanation for the discriminatory employment practices and to conclude, for Title VII purposes, that HTI was motivated by discriminatory intent in its conduct toward Brinkley–Obu vis-a-vis Turner.

While HTI has argued and we must perhaps address the contention that Brinkley–Obu failed to present sufficient evidence to support the jury verdict in her favor, HTI has made yet another argument that, if correct, would moot the other issues before the court. Because of its critical importance to the disposition of the remaining issues, we will first address HTI's argument that Brinkley–Obu's claims are barred by the statute of limitations. If that argument is not dispositive, subsequently, we will discuss the sufficiency of the evidence adduced to support Brinkley–Obu's claims, and, ultimately, presented in support of the jury's verdict.

### Statute of Limitations

■ HTI has argued that Brinkley–Obu's Equal Pay Act claims with respect to Turner and Parnes are time-barred because both of those male comparators ceased to be employed or ceased to hold equivalent positions prior to the statutory limitations period. HTI asserts that the statutory time period began to run on October 9, 1990, two years before Brinkley–Obu filed suit. Brinkley–Obu submitted evidence of discrimination concerning Parnes and Turner which covered work periods prior to October 9, 1990. The district court concluded that the factual scenario described at trial permitted Brinkley–Obu to pursue her claims under a continuing discrimination theory.[19] HTI has denied the validity of that theory in the context of the claims.

HTI has also argued that Brinkley–Obu's Title VII claim with respect to Turner is time-barred because Turner left HTI in April 1990. HTI has suggested that there was no current Title VII violation with respect to Turner at the time Brinkley–Obu filed her claim. The jury found that HTI discriminated against Brinkley–Obu within the meaning of Title VII each pay period that it paid Brinkley–Obu less for doing the same job Turner had performed while employed at HTI. The district court wrote that the relevance of Turner's work and pay as evidence did not diminish and become barred simply because he was no longer employed by the defendant. The relevant question, as the district court pointed out, is whether, during the statutory time period, the plaintiff was being paid less on account of her sex. *Kim v. Coppin State College*, 662 F.2d 1055, 1060–61 (4th Cir.1981).

Under Title VII, a charge of discrimination must be filed with the EEOC within 180 days after the alleged unlawful employment practice occurs. 42 U.S.C. § 2000e–5(e). The "occurrence" of the discriminatory act triggers the statutory period. Under the Equal Pay Act, an action "shall be forever barred unless commenced within two years after the cause of action accrued." 29 U.S.C.

---

nate, the Supreme Court [in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)] has set out the *prima facie* case the plaintiff must prove, from which a court may infer intentional discrimination." *Plemer*, 713 F.2d at 1135. The *prima facie* proof will vary with the different factual situations before the court. *Id.* The plaintiff may also introduce statistics evidencing patterns of discriminatory conduct or practices in support of the *prima facie* case.

**19.** The continuing discrimination theory applies to both the Equal Pay Act and Title VII claims. *Nealon v. Stone*, 958 F.2d 584, 590 n. 4 (4th Cir.1992).

§ 255(a).[20] The meaning of the words "occurrence" and "accrued" have become the focal point of the dispute regarding the statute of limitations.

"The Supreme Court has indicated that the statutes of limitations for actions predicated upon employment discrimination are triggered at the time when the alleged discriminatory act occurred, and not at the time when the last discriminatory effects have been manifested." *E.E.O.C. v. Penton Industrial Pub. Co.*, 851 F.2d 835, 837–38 (6th Cir.1988) (citing *United Air Lines, Inc. v. Evans*, 431 U.S. 553, 558, 97 S.Ct. 1885, 1888, 52 L.Ed.2d 571 (1977)). HTI has argued that, if Brinkley–Obu has experienced any discrimination at all, the discriminatory act itself occurred well over two years ago and the fact that she continues to be paid less is merely an "effect" of that act. Our cases demonstrate, however, that in a compensation discrimination case, the issuance of each diminished paycheck constitutes a discriminatory act.

The discriminatory act at issue in the instant case is HTI's payment of unequal wages to Brinkley–Obu. HTI has mischaracterized the act as "paying Turner more money" when the violation is actually paying Brinkley–Obu less money. HTI was paying Brinkley–Obu unequal wages on a bi-weekly basis at the time she brought the suit.[21] The statutes of limitations applicable to Equal Pay Act and Title VII violations constitute a jurisdictional bar that operates in relation to the injury to the plaintiff. Statutes of limitations do not operate as an evidentiary bar controlling the evidence admissible at the trial of a timely-filed cause of action. In other words, the statute of limitations does not operate to limit the evidence Brinkley–Obu may introduce regarding her co-workers. In the context of the Equal Pay Act, the statute of limitations does not dictate which co-workers the plaintiff may submit as comparators.[22]

> It is immaterial that a member of the higher paid sex ceased to be employed prior to the period covered by the applicable statute of limitations period for filing a timely suit under the EPA. The employer's continued failure to pay the member of the lower paid sex the wage rate paid to the higher paid predecessor *constitutes a prima facie continuing violation.* Also, it is no defense that the unequal payments began prior to the statutory period.

29 C.F.R. § 1620.13(b)(5) (emphasis added).[23]

HTI has argued that the district court erred in permitting Brinkley–Obu's claims under the doctrine of continuing discrimination, a doctrine endorsed by the EEOC. HTI has characterized Brinkley–Obu's lesser paychecks as "effects" of a past act of discrimination under *United Air Lines, Inc. v. Evans*, 431 U.S. 553, 558, 97 S.Ct. 1885, 1889, 52 L.Ed.2d 571 (1977). *Evans* involved a company policy that prohibited flight attendants from being married. That case did not involve a compensation scheme. The very

---

**20.** The two year limitation applies to non-willful violations. The jury found HTI's discrimination to be non-willful. Under the limitations period, the violations Brinkley–Obu alleged had to occur between October 9, 1990 and October 9, 1992 when she filed her complaint. HTI continued to pay her less than comparably situated males throughout the two years at issue.

**21.** HTI erroneously assumes that the accrual of the Title VII action must have been either 1) when Brinkley–Obu became aware of Turner's salary or 2) when Turner ceased to be employed. Both of these options focus on Turner. The action is not about Turner. The discrimination is being perpetrated against Brinkley–Obu, and the relevant injury or violation is the diminished paycheck she continues to receive on a regular basis. Turner's work and wages are merely pieces of evidence relevant to the legitimacy of Brinkley–Obu's case.

**22.** When a jury awards damages for a Title VII or Equal Pay Act violation, the jury is allowed to award a sum compensating the victim only for the period of time permitted under the statute. Thus, although Brinkley–Obu may use Turner and Parnes as comparators to demonstrate that she has been paid less for substantially similar work, the jury may not award damages for any violations occurring prior to October 1990. The evidence of discrimination occurring before 1990 also proves the existence of discrimination after 1990, and the jury's damage award reflects the injury to the plaintiff that occurred within the statutory limitations period.

**23.** *See also* 29 C.F.R. § 1620.13(b)(2) and (4) regarding legitimacy of predecessors as comparators.

nature of a compensation scheme necessitates the existence of a current violation with each pay period. The Supreme Court's decision in *Bazemore v. Friday,* 478 U.S. 385, 395–96, 106 S.Ct. 3000, 3006, 92 L.Ed.2d 315 (1986), rather than the *Evans* decision, provides the relevant statement of the law with regard to discrimination in compensation under Title VII.[24] Along with the Supreme Court, we have applied the doctrine of continuing discrimination to Title VII and Equal Pay Act compensation cases in which paychecks have been characterized as current or "continuing" violations. *Nealon v. Stone,* 958 F.2d 584, 592 (4th Cir.1992); *Brewster v. Barnes,* 788 F.2d 985, 993 (4th Cir.1986); and *Jenkins v. Home Ins. Co.,* 635 F.2d 310, 312 (4th Cir.1980).

We have held that each issuance of a paycheck to a female employee at a lower wage than that issued to her male counterpart constitutes a new discriminatory action for purposes of Equal Pay Act limitations accrual. *Nealon,* 958 F.2d at 591. "We hold ... that Nealon's Equal Pay Act claim is not barred by the statute of limitations because she asserts a continuing violation. This continuing violation theory is equally applicable to Title VII." *Nealon,* 958 F.2d at 590 n. 4. Instrumental in our determination in *Nealon* was the Supreme Court's treatment of the issue of separate paychecks in *Bazemore v. Friday,* 478 U.S. 385, 106 S.Ct. 3000, 92 L.Ed.2d 315 (1986). *Nealon,* 958 F.2d at 591.

In determining that the continuing violation principle that applies under *Bazemore* to race discrimination violations of Title VII applies also to sex discrimination allegations under the Equal Pay Act, we did not rely on or discuss the fact that Nealon's male counterpart was still employed during the limitations period. That was not the operative fact in the decision. Rather, we characterized the plaintiff's paychecks as continuing violations of the Act. The focus of our analysis was the plaintiff, *i.e.,* the victim of the employer's discrimination, and the employer's actions with regard to the plaintiff. Had Nealon's male counterpart left his job before or during Nealon's court action, there is no indication that we would have rendered an opposite verdict. An opposite verdict, in effect, would suggest that Nealon was no longer being discriminated against because, even though she was being paid the same low wages, there was no longer anyone to whom she could be compared. Such an analysis would allow employers to evade the purpose of the Equal Pay Act by terminating more highly paid male employees and retaining their lesser paid female employees at the discriminatory pay rate.

In *Brewster,* we held that the statute of limitations did not bar Brewster's Equal Pay Act claim, and that the defendants' refusal to pay Brewster the same salary as that received by male correctional officers certified in 1975 constituted a continuing violation up to the last day of her employment.[25] *Brewster,* 788 F.2d at 993 (citing *Jenkins,* 635 F.2d at 312). Again, our focus was on the violation perpetrated against the plaintiff, not the employment status of comparable co-workers.

*Jenkins* may provide the most convincing statement of our position on paychecks because we decided that case in 1980 before the Supreme Court provided guidance on the issue in *Bazemore v. Friday* in 1986. In *Jenkins,* the district court applied the rule in *Evans* and dismissed the plaintiff's Equal Pay Act and Title VII claims finding that the "act" which gave rise to the plaintiff's claims occurred when the company hired her at a lower starting salary. Although the inequity caused Jenkins to be paid less than her peers throughout the duration of her employment, the district court held that the statute of limitations had run because 1) the discriminatory violation that gave rise to her claim occurred when she was hired at a lower salary; and 2) her cause of action accrued on

---

24. "Each week's paycheck that delivers less to a black than to a similarly situated white is a wrong actionable under Title VII, regardless of the fact that this pattern was begun prior to the effective date of Title VII." *Bazemore,* 478 U.S. at 395–96, 106 S.Ct. at 3006.

25. In denying HTI's motion for judgment as a matter of law, the district court relied on the reasoning set forth in *Brewster.*

that date, or, at the latest, the day she discovered the discrepancy in 1975 or 1976. The district court held that the continuing wage differential did not constitute a continuing violation.

We reversed, however, distinguishing the Supreme Court's *Evans* decision which addressed the inequitable "no marriage" rule imposed on flight attendants. We found that *Evans* involved a one-time instance of discrimination while, in *Jenkins,*

> the Company's alleged discriminatory violation occurred in a series of separate but related acts throughout the course of Jenkins' employment. Every two weeks, Jenkins was paid for the prior working period; an amount less than was paid her male counterparts for the same work covering the same period. Thus, the Company's alleged discrimination was manifested in a continuing violation which ceased only at the end of Jenkins' employment.

*Jenkins,* 635 F.2d at 312. Although the male employees receiving higher wages than Jenkins were employed at the same time she was employed, the simultaneous employment of the comparable males was not critical to the decision. As we explicitly stated, the violation "ceased only at the end of Jenkins' employment." We established the principle that an act of sex discrimination in compensation first inflicted at the date of hiring can thereafter continually violate the plaintiff's rights. *Jenkins,* 635 F.2d at 312. Because *Nealon, Brewster,* and *Jenkins* involved comparisons between employees who were employed simultaneously, it is necessary to review the law applicable to predecessor and successor comparators.

Both the regulations promulgated by the EEOC and cases from several circuits support Brinkley–Obu's assertion that, for the

purposes of establishing her Equal Pay Act claim, she is free to use male comparables who were her predecessors or successors, as long as they performed substantially similar work.[26] 29 C.F.R. § 1620.13(b)(2), (4) and (5); *E.E.O.C. v. First Citizens Bank of Billings,* 758 F.2d 397, 402 (9th Cir.) (holding that the Equal Pay Act does not require that jobs being compared be performed simultaneously, but also encompasses situations when an employee of one sex is hired to replace an employee of the opposite sex), *cert. denied,* 474 U.S. 902, 106 S.Ct. 228, 88 L.Ed.2d 228 (1985); *Patkus v. Sangamon–Cass Consortium,* 769 F.2d 1251, 1260 (7th Cir.1985) (holding that the portion of the plaintiff's claim that rested on the "differential between her salary and that of her successors ... does make out a *prima facie* case of a violation of the Equal Pay Act [and that] [t]he salary paid to a successor who performs substantially the same work may provide a basis for an equal pay action"); *Bartelt v. Berlitz School of Languages of Amer., Inc.,* 698 F.2d 1003, 1005 n. 1 (9th Cir.), *cert. denied,* 464 U.S. 915, 104 S.Ct. 277, 78 L.Ed.2d 257 (1983) (noting that, under the Equal Pay Act, plaintiffs need not rely solely on a discriminatory wage differential between *current* employees to establish a violation, but may make comparisons to prior employees)[27]; and *Hodgson v. Behrens Drug Co.,* 475 F.2d 1041, 1049 (5th Cir.), *cert. denied,* 414 U.S. 822, 94 S.Ct. 121, 38 L.Ed.2d 55 (1973) (noting that the Equal Pay Act applies to jobs "held in immediate succession as well as simultaneously"). An Eighth Circuit case indicates that the successors and predecessors can be non-immediate. *Clymore v. Far–Mar–Co., Inc.,* 709 F.2d 499, 502–03 (8th Cir.1983) (if the factual circumstances indicate that non-immediate compari-

---

26. Language from a Supreme Court case also supports the point. *County of Washington v. Gunther,* 452 U.S. 161, 179 n. 19, 101 S.Ct. 2242, 2253 n. 19, 68 L.Ed.2d 751 (1981). Both the majority and dissenting opinions recognize that the Equal Pay Act "provides an action for sex-based wage discrimination by women who hold jobs not *currently* held by men." *Id.* at n. 19 (emphasis in original). The dissent wrote, "[u]nder the Equal Pay Act, it is not necessary that every Equal Pay Act violation be established through proof that members of the opposite sex

are *currently* performing equal work for greater pay." *Id.* at 201, 101 S.Ct. at 2264.

27. The *Bartelt* court cites *County of Washington v. Gunther,* 452 U.S. 161, 179 n. 19, 101 S.Ct. 2242, 2253 n. 19, 68 L.Ed.2d 751 (1981). As noted above, note 19 refers to and does not disagree with the point made by the *Gunther* dissent that Equal Pay Act violations need not be based on comparisons to employees currently performing equal work for unequal pay. *Bartelt,* 698 F.2d at 1005 n. 1.

sons are appropriate, neither the statute nor the cases prohibit such comparisons in analyzing equal pay violations).[28]

Taken together, the cases indicate that paychecks are to be considered continuing violations of the law when they evidence discriminatory wages. In order to demonstrate that a violation has occurred, a plaintiff may offer predecessors and successors, both immediate and, in appropriate circumstances, non-immediate, as well as co-workers, for purposes of comparison.

HTI's legal and policy arguments for a rule contrary to that established by the foregoing cases, drawn largely from *E.E.O.C. v. Penton Industrial Pub. Co., Inc.*, 851 F.2d 835 (6th Cir.1988), are unpersuasive. In *Penton*, the Sixth Circuit held that the plaintiff's Equal Pay Act and Title VII claims were barred by the statute of limitations. *Id.* at 839. *Penton* addressed a situation in which two female editors were paid less than a male editor doing comparable work.[29] The male editor was eventually terminated in 1981 for failure to meet his writing deadlines. The female editors remained with the company until 1982. They did not file claims until they left the company in 1982, over one year after the male editor had been terminated.

In *Penton*, the EEOC argued that the defendant company's continued payment of the female editors at a lesser salary than the company had paid the male constituted a continuing violation of the Equal Pay Act. The Sixth Circuit rejected the EEOC's argument based on 29 C.F.R. § 1620.13(b)(2)–(5), distinguishing the regulations offered by the

EEOC as ones not applicable to the *Penton* facts. The *Penton* court wrote

> These regulations ... deal with instances where there was no similarly situated employee of the opposite sex working at the time of the alleged violation, and have been limited in their application to cases where the aggrieved party who initiated the discrimination charge was either the *predecessor or successor* of the more highly paid employee.

*Penton*, 851 F.2d at 839, n. 8 (citing *Clymore, Bartelt,* and *Hodgson* (emphasis added)). The court went on to explain that there were similarly situated employees working at the time plaintiffs in *Penton* were working, and the plaintiffs were neither predecessors nor successors of the comparator in that case. Thus, the Sixth Circuit declared that interpretive regulations offered by the EEOC were not applicable to the facts of that case.[30]

As illustrated in the facts of the instant case, however, Brinkley–Obu was the successor of both Turner and Parnes.[31] Thus, even under the Sixth Circuit's reasoning in *Penton*, 29 C.F.R. § 1620.13(b)(5) is applicable to Brinkley–Obu's case. A Sixth Circuit opinion published in May 1994 clearly establishes that court's position with respect to continuing violation theory in the predecessor/successor context. In *Gandy v. Sullivan County,* 24 F.3d 861 (6th Cir.1994), the Sixth Circuit affirmed an award of damages to the plaintiff under the Equal Pay Act. Rosemarie Gandy held the position of Safety Director for Sullivan County. For the eighteen months prior to the time Gandy acquired the position, the County employed Steven Law-

**28.** In *Clymore*, the Eighth Circuit permitted comparisons with one immediate predecessor and two non-immediate predecessors. The court disallowed a comparison with a successor only because the court found that the plaintiff and the successor had not performed substantially equal jobs.

**29.** One feature which distinguishes the instant case from *Penton* is the fact that Brinkley–Obu could be considered the non-immediate predecessor or successor to both Turner and Parnes. In *Penton*, the three individuals held separate, non-related jobs. Hence successorship or predecessorship did not exist.

**30.** The *Penton* result is contrary to the EEOC's position on the issue as set forth in 29 C.F.R.

§ 1620.13(b)(3). Under the *Penton* rule, employers may terminate more highly paid male employees and retain lesser paid female employees without violating the Equal Pay Act.

**31.** Brinkley–Obu was also the predecessor of Turner in that she performed the Hardware Quality Assurance position under the title of Supervisor beginning in March 1988 along with the Quality Control responsibilities beginning in August 1988 prior to the time that she left for maternity leave in October 1988. At that time, her supervisor, Ronald Smith, gave her duties to Turner who became the "acting Supervisor" and later, the Manager, in February 1989.

son as the "Assistant Safety Director and Community Development Project Coordinator." In a wage classification system designating jobs as "A" through "P" with "A" being the lowest, Lawson performed the job as a "K" level employee while Gandy was assigned an "E" and later an "F" status. A jury concluded that the two positions were essentially equal and awarded Gandy compensatory and liquidated damages. The defendants claimed that Gandy's Equal Pay Act claim was barred by the statute of limitations. Citing *Penton* and 29 C.F.R. § 1620.-13(b)(5), the district court stated that "in predecessor/successor equal pay cases such as this, a 'continuing violation' is established and the action is not time-barred." *Gandy*, 24 F.3d at 863–64. The Sixth Circuit agreed that the action was not barred by the statute of limitations: "[t]he Equal Pay Act is violated each time an employer presents an 'unequal' paycheck to an employee for equal work." *Id.*

While the court acknowledged that the district court had relied on the theory of "continuing violations," the court concluded that Gandy's claim alleged a "continuing wrong" that did not necessitate the invocation of the continuing violation doctrine. The *Gandy* court characterized the continuing wrong as one in which "each continuation or repetition of the wrongful conduct may be regarded as a separate cause of action for which suit must be brought within the period beginning with its occurrence." *Id.* The court limited *Penton* to its facts by characterizing it as a case involving "the employment of a similarly-situated male co-worker who was being paid at a higher rate than a female co-worker before his employment was terminated." *Id.* Distinguishing the facts of *Penton*, the court also expressed some skepticism about the logic of *Penton*'s reasoning:

> Although the court in *Penton* does not suggest how the discrimination ceased since the female employees continued to be paid the discriminatory wage rate, the situation presented by this case is different and we therefore are not constrained by

*Penton.* Unlike the similarly-situated male co-worker of Penton, this case presents the predecessor/successor question in which a female employee was always paid less than her male predecessor, a scenario *Penton* specifically declined to address.... Each unequal paycheck to Gandy was a violation of the Equal Pay Act. The discrimination never "ceased," as it was found to in *Penton,* since every paycheck Gandy received was calculated at a discriminatory rate.

*Id.* at 865.

The violation of the Equal Pay Act is, assuming a female plaintiff, the paying of the female employee less, not merely the paying of the male employee more.[32] The available remedies support such an interpretation of the act. An employer may not reduce a male employee's salary to remedy the discrimination. The employer may only increase the female employee's salary so that it is commensurate with the male's. Thus, it is the injury to the plaintiff claiming the equal pay violation that should provide the measuring stick for the statute of limitations.

The district court's examination of the issue on consideration of HTI's motion for judgment as a matter of law is in accord with the foregoing analysis.

> The Fourth Circuit has held that each and every refusal to pay a plaintiff's salary equal to that of a similarly situated male constitutes a continuing violation for purposes of Equal Pay Act statute of limitations. *Brewster v. Barnes,* 788 F.2d 985, 993 (4th Cir.1986)....
>
> [T]here was a current violation with respect to Turner. This violation was that the jury found with every pay period, including those within the statutory time period, defendant was paying plaintiff less than a similarly situated male. That Turner ceased employment with the defendant does not change the fact defendant *continued to pay plaintiff less for equal work during the statutory time period.* The relevance of Turner's work and pay as evidence did not diminish and become

---

**32.** The Equal Pay Act, written in gender-neutral terms, is available to remedy discriminatory ac-

tions against both men and women.

barred simply because he was no longer employed by the defendant.

The relevant question is "During the statutory time period, was plaintiff being paid less on account of her sex?" The jury answered yes, and *the failure to give plaintiff equal pay on account of sex was ongoing* and affected the plaintiff during the statutory time period.

In sum, "evidence of *present* discriminatory activity" includes the continued payment of a lesser wage to a member of one sex than to a member of the other sex who has done or is doing substantially similar work. *Jenkins, Brewster,* and *Nealon* provide the groundwork for such a holding which is in accord with the EEOC's understanding of the purposes of the Equal Pay Act as expressed in 29 C.F.R. § 1620.13(b)(2)–(5), the Supreme Court's *Bazemore* decision in the context of Title VII, and the dicta in *Gunther.* Brinkley–Obu is allowed to recover only those damages that accrued during the two years prior to the date she filed her Equal Pay Act claim pursuant to 29 U.S.C. § 255(a). *Nealon,* 958 F.2d at 591 n. 5; *Brewster,* 788 F.2d at 993. Here, the jury's Equal Pay Act award reflects only damages that accrued between October 1990 and October 1992.

### Sufficiency of the Evidence— Equal Pay Act Claims

As the facts outlined above demonstrate, the jury reached a reasonable decision in light of the evidence in Brinkley–Obu's favor. HTI faces an extremely heavy burden in challenging the jury's verdict. In reviewing a denial of a motion for judgment as a matter of law, we have written,

> we are constrained when reviewing a case in which the sufficiency of the evidence is at issue to view the evidence in the light most favorable to the party against whom the motion is made, giving that party the benefit of all reasonable inferences from the evidence. We may not weigh the evidence, pass on the credibility of the witnesses, or substitute our judgment of the facts for that of the jury.

*Charleston Area Med. Ctr., Inc. v. Blue Cross and Blue Shield,* 6 F.3d 243, 247–48 (4th Cir.1993). A mere scintilla of evidence is insufficient to sustain a verdict. *Id.* "If there is 'evidence of such quality and weight that reasonable and fair-minded [people] in the exercise of impartial judgment could reasonably return a verdict for the nonmoving party,' the jury verdict should be sustained." *Goodwin v. Metts,* 885 F.2d 157, 160 (4th Cir.1989) (citations omitted), *cert. denied,* 494 U.S. 1081, 110 S.Ct. 1812, 108 L.Ed.2d 942 (1990). Both the jury and the district court concluded that there was sufficient evidence to support a verdict in the plaintiff's favor.[33]

As the district court noted when it denied HTI's motion for judgment as a matter of law, whether the work performed by Brinkley–Obu and her male comparator was substantially equal, *i.e.,* whether the jobs to be compared have a common core of tasks, is purely a question of fact to be decided by the fact-finder. *Brewster,* 788 F.2d at 991. Given the evidence in this case, as the district court noted, "it cannot be said that no reasonable jury could find as they [sic] did."

In addition, the question whether HTI successfully established one of the affirmative defenses by showing that the protracted pay differential was based on "factors other than sex" was a question of fact subject to review under a clearly erroneous standard. *Brewster,* 788 F.2d at 992.[34] The evidence viewed in the light most favorable to the plaintiff supports the jury's verdict that "other factors" could not explain HTI's disparate treatment of Brinkley–Obu.

### A. Turner

Regarding William Turner, the evidence permitted the jury to make the following findings. Brinkley–Obu performed the responsibilities of HQAS (when the position of Manager did not exist) beginning in March

---

**33.** The jury rejected Brinkley–Obu's claims based on one of the five suggested comparators, Baker. The evidence did not demonstrate that he was performing substantially similar work. The fact that the jury distinguished between the comparators, rejecting one and accepting others, suggests that the jury carefully analyzed the claims submitted.

**34.** In *Brewster,* we reviewed a district court's decision rather than a jury's verdict.

1988 as an E–2 for $39,540 a year. When she became the permanent HQAS in charge of Quality Control in August 1988 she received $41,904 at an A–3 level. Turner assumed Brinkley–Obu's responsibilities in October 1988 on an "acting" basis at a salary of $44,040 at an E–3 level. In February 1989, right before Brinkley–Obu returned from maternity leave, Smith created a managerial position consisting of those same responsibilities, promoted Turner to an "OD" level, and gave him an $18,000 raise (40%+ increase) to $62,040. Turner took leave in November, only nine months later, and left HTI in April 1990. In April, Brinkley–Obu resumed the Hardware responsibilities as Hardware Quality Assurance Manager at an "OC" rather than an "OD" level, making only $44,604. In July she began to receive $49,836. Several months after she took on the Software responsibilities, HTI raised her salary to $54,360. Tovsen added Quality Control to her work load in January 1992 without a corresponding pay increase. Finally, in September 1992, she began earning $57,624—an amount approximately $5,000 less than Turner's salary for handling fewer managerial responsibilities.

The date that Turner left HTI's employ is not relevant to the evidentiary context as noted above. The relevant consideration is the fact that Brinkley–Obu continued to be underpaid by HTI until the time she filed the suit. HTI has noted that, while Turner was employed by HTI, he and Brinkley–Obu were always in a superior-subordinate relationship to each other, preventing a showing of substantial equality. The jobs Brinkley–Obu and Turner were performing simultaneously, however, do not form the basis of her comparison. Rather, Brinkley–Obu compares discrete time periods when she and Turner were performing the same responsibilities, whether she was his predecessor or successor. Sufficient evidence supports the jury's verdict that HTI violated the Equal Pay Act with respect to Turner in payments for the two years prior to her filing suit.

Additional evidence discussed below supports the jury's Title VII verdict in favor of Brinkley–Obu. Brinkley–Obu's relationship with Smith; their discussions about her salary; Brinkley–Obu's loss of responsibility while on maternity leave; Turner's inexplicable $18,000 raise for doing the same work Brinkley–Obu had been doing before she took leave; Brinkley–Obu's supervisor's explicit comments that she needed to choose between "having a career and being a mama"; and the hostile atmosphere Brinkley–Obu encountered when she returned to work, all support the jury's finding of intentional discrimination based on sex under Title VII. Under the facts, a reasonable jury could conclude that HTI's suggestion that Turner was paid more because of factors other than sex was pretextual and that HTI's persistence in paying Brinkley–Obu unequal wages for the substantially equal work she was performing was motivated by discriminatory intent.

### B. *Parnes*

Based on the evidence adduced at trial, the jury could have drawn the following conclusions with respect to Parnes. Both Parnes and Brinkley–Obu performed the position of SQAM at different times. Parnes performed the job beginning in November 1989 at an "OE" level making $55,860. He was demoted to an E–5, but continued to receive at least two raises. While he was making $66,300 in a nonsupervisory, lead-person position, Brinkley–Obu took over his Software responsibilities. When she acquired the Software position, she was making only $49,836 at an "OC" level. When she finally brought suit, Brinkley–Obu was earning only $57,624 even though she was also performing the additional responsibilities of Hardware Quality Assurance and Quality Control. HTI tries to emphasize that Brinkley–Obu thought her responsibilities were greater and more difficult than Parnes' rather than substantially similar. Brinkley–Obu testified that she was responsible for additional duties when she was performing the software position that Parnes had performed. As noted in the EEOC interpretive regulations, additional duties performed by the lesser paid employee do not remove the claim from the ambit of the Equal Pay Act. At trial, witnesses from HTI testified to the similarity of the software positions.

### C. *Monseur*

Finally, with regard to Monseur, the jury could have drawn the following conclusions. Monseur held the position of Quality Control Manager at the "OD" level starting at $60,000. As a result of raises he was making $63,000 even after he was demoted to an E–5, nonsupervisory position. Brinkley–Obu performed the Quality Control function for a short time prior to her maternity leave in 1988. She also performs that position currently. She gained that responsibility in January 1992 at which time she was making $54,360. It was not until September 1992 that she received a raise to $57,624. At that time she was also performing Hardware and Software responsibilities. HTI has attempted to compare Brinkley–Obu's current job as a Manager with Monseur's current job as a lead person. Brinkley–Obu's comparison, however, is based on their performance of the same position—Quality Control Manager.

Several witnesses testified regarding the nature of the jobs held by Turner, Parnes and Monseur, including the skill, effort and responsibilities those jobs required. The jury had sufficient evidence on which to base a conclusion that Brinkley–Obu was performing substantially similar work with Parnes, Turner, and Monseur. Most importantly, after hearing all of the evidence and passing on the credibility of each witness before the court, the jury concluded that Brinkley–Obu was performing jobs substantially equal to those performed by three of the four male comparators she offered. The judge, in denying HTI's motion for judgment as a matter of law also concluded that sufficient evidence existed to warrant the jury's verdict.

### D. *HTI's Affirmative Defense to the Equal Pay Act Claims*

■ It is understandable and quite legal for HTI to consider the experience and education of prospective employees in setting initial salaries. Brinkley–Obu contested her initial salary at the time she was hired, but she has not based her lawsuit on that premise. Rather, she contends that she has done

equal work to the men employed on her level (or below her) in her department, often the same jobs, but has been paid substantially less for performing substantially similar work. The Equal Pay Act requires employers to pay employees of both sexes equally when they perform substantially equal work. The Equal Pay Act also allows employers to establish any of four affirmative defenses to Equal Pay claims showing that the disparities are the result of "any other factor other than sex." The burden is on the employer to prove such "other factors" by a preponderance of the evidence.

HTI tried to show that experience and education considered in the initial hiring process explain and account for the disparities Brinkley–Obu experienced later in her career.[35] HTI has argued that "[t]he jury could not reasonably have rejected HTI's evidence of a gender-neutral compensation system and [that] its Equal Pay Act verdict should be reversed." Considering the inconsistencies in HTI's treatment of its employees and the evidence adduced at trial showing that less experienced people (including men) are often paid more highly than more experienced people (including men) at HTI, it is not "more likely than not" that experience can account for the disparities Brinkley–Obu has demonstrated over the course of her law suit. The jury reasonably rejected HTI's affirmative defenses.

### *Sufficiency of the Evidence—Title VII*

■ Brinkley–Obu established her case under Title VII by meeting the standards for showing equal work as required by the Equal Pay Act, and by discrediting HTI's proffered explanation of the inequities she encountered with respect to Turner when the two worked under Smith. The same evidence regarding unequal wages for equal work that supports the Equal Pay Act claim against Turner also provides support for the jury's verdict that HTI discriminated against Brinkley–Obu in terms of compensation with respect to Turner under Title VII. As the discussion of the facts and the sufficiency of the evidence have

---

**35.** Despite Brinkley–Obu's experience and education, HTI placed her as an E–2 when she was qualified to come in as an E–4 or E–5.

shown, Brinkley–Obu did establish that she performed substantially similar work to the comparators. In addition, Brinkley–Obu presented evidence concerning her employment with HTI and her supervisor, Smith, unnecessary to prove her Equal Pay Act claim. That additional evidence supports an inference of intentional discrimination necessary to support a finding of liability under Title VII.

Brinkley–Obu may prove her Title VII case through direct evidence of discrimination or through the cumulative effect of indirect evidence of her employer's motivation. She presented testimony and evidence at trial establishing HTI's discriminatory motivation with regard to her compensation vis-a-vis Turner.

When Brinkley–Obu asked why she was being requested to offer Turner, a subordinate, a higher salary than she was making, her supervisor responded, "We got you cheap." When Brinkley–Obu left on maternity leave, the same supervisor stripped her of her responsibilities and transferred them to Turner, the new hire. At that time, he created the managerial position and promoted Turner to that position giving him an $18,000 raise to do essentially the same job plaintiff had been performing prior to the time she took leave. The promotion took place only one or two weeks before Brinkley–Obu returned to work. When she returned to work as Turner's subordinate, her infant experienced several illnesses. Taking authorized leave to attend to her family responsibilities she was told to choose "between having a career and being a mama." Although Turner was ultimately fired, and plaintiff ultimately began performing all of his responsibilities in addition to several others, she is still being paid less than Turner was in April of 1990 when he left HTI.

Although these incidents occurred prior to the limitations period, the evidence of a pattern or practice that pre-dated the relevant charge period is relevant for the limited purpose of inferring from it the continuation of the practice into the limitations period. *Lewis v. Bloomsburg Mills, Inc.*, 773 F.2d 561, 568 n. 12 (4th Cir.1985) (noted in the context of employer's practice of failing to hire black women). HTI started out paying Brinkley–Obu less than she deserved to be paid even according to HTI's own payment schedule. HTI paid her less than Turner despite the fact that he was hired as her subordinate because he had superior experience coming in to HTI. However, HTI inexplicably gave him an $18,000 raise to perform the same responsibilities plaintiff had performed prior to her maternity leave. HTI's supervisor, Smith, exhibited sexist attitudes and conduct in his treatment of plaintiff until he left HTI. The company, though made aware of Smith's activities, never reprimanded Smith nor did it correct plaintiff's situation with respect to Turner. HTI still has not raised plaintiff's salary to that earned by Turner when he left the job in April 1990 despite the fact that she has taken over his responsibilities completely. Sufficient evidence existed to support the jury's Title VII verdict.

### Compensatory Damages and the Civil Rights Act of 1991

■ The district court rejected HTI's argument that the jury's Title VII damages award included $10,000 in compensatory damages based on conduct that occurred prior to November 21, 1991. The district court held that the Civil Rights Act of 1991 was *not* to be applied retroactively and instructed the jury accordingly. Although the jury received permission to consider acts occurring before December 1991 in determining whether or not there was a Title VII violation (i.e., liability), the court instructed the jury that it was *not* to use that information for the purposes of damages. Because jurors are presumed to follow the law and the instructions given by the court, absent evidence to the contrary, the court felt it could be presumed that the jury followed the instructions in computing the damages. *Richardson v. Marsh*, 481 U.S. 200, 211, 107 S.Ct. 1702, 1709, 95 L.Ed.2d 176 (1987) (noting pragmatic rule that juries are presumed to follow their instructions). In essence, then, the district court was of the opinion that the compensatory damages award by the jury did not include what HTI has referred to as retroactive damages.

HTI has argued that the district court erred by failing to set aside the compensatory damages award under Title VII. Compensatory damages in Title VII actions were not authorized until the enactment of the Civil Rights Act of 1991 on November 21, 1991. In *Landgraf v. USI Film Prods.*, —— U.S. ——, ——, 114 S.Ct. 1483, 1508, 128 L.Ed.2d 229 (1994), the Supreme Court held that the provisions of the Civil Rights Act of 1991 creating the right to recover compensatory and punitive damages for certain Title VII violations do not apply retroactively.

In the instant case, the court instructed the jury that the Civil Rights Act of 1991 was not to be applied retroactively and that the jury could not consider any "acts" or conduct by HTI which occurred prior to December 25, 1991 for purposes of damages.[36] The jury awarded the plaintiff compensatory damages based upon its finding of a Title VII violation with respect to Turner. HTI has argued that because Turner's employment at HTI was terminated in April 1990, the jury improperly applied the Civil Rights Act of 1991 retroactively. As the foregoing analyses of the statute of limitations and the sufficiency of the evidence have shown, however, the jury apparently awarded compensatory damages based on HTI's continuing violations, i.e., acts which occurred after December 25, 1991, as instructed by the district court. HTI continued to violate the Act because HTI continued to pay Brinkley–Obu less throughout the relevant time period. Under this analysis, retroactivity is not an issue because the jury's damage award was based on the injury the plaintiff continued to suffer with the issuance of each paycheck after the enactment of the Civil Rights Act of 1991.

### Admissibility of Evidence

■ This court reviews the district court's decision to admit exhibits into evidence for an abuse of discretion. *Persinger v. Norfolk & W. Ry.*, 920 F.2d 1185, 1187 (4th Cir.1990).

HTI objected at trial to the admission of two exhibits numbered 5D and 35 which de- picted the salaries of managers and which allegedly demonstrated the under-utilization of women in HTI's hiring and promotion practices. Exhibit 5D consisted of two pages of graphs based on information derived from HTI's Affirmative Action Plan. The graphs purported to show a statistical under-utilization of female supervisors in HTI's Herndon facility as evidence of discrimination in Brinkley–Obu's compensation. Exhibit 35 provided a list of all of the salaries and the gender of all HTI managers at the "OD" level from 1988 to 1991.

In *Lilly v. Harris–Teeter Supermarket*, 720 F.2d 326, 337–38 (4th Cir.1983), *cert. denied*, 466 U.S. 951, 104 S.Ct. 2154, 80 L.Ed.2d 539 (1984), we noted that evidence of discriminatory intent in one employment context, e.g., hiring, may be probative of discriminatory intent in a different employment context, e.g., promotion, but only where it has been demonstrated that the same managerial personnel were involved as decision-makers in both settings. HTI has asserted that, because plaintiff did not establish that the managerial personnel who were responsible for the discrimination against her were also responsible for the alleged evidence of discrimination provided by the charts, the charts should not have been admitted.

Brinkley–Obu argues that the black letter law in this circuit, i.e., *Lilly*, did allow the admission of the exhibits as corroborative evidence of salary discrimination against women in supervisory positions. It is unnecessary to resolve the *Lilly* dispute in light of the harmless error analysis.

HTI has argued that the admission of these exhibits necessarily tainted the jury's verdict and mandates a new trial pursuant to FRCP 61. "[T]he decision to grant a new trial '"is a matter resting in the sound discretion of the trial judge, and ... his action thereon is not reviewable on appeal, save in the most exceptional circumstances."'" *Persinger v. Norfolk & W. Ry.*, 920 F.2d 1185, 1189 (4th Cir.1990). We may affirm the district court's denial of HTI's motion for a new

---

**36.** The December 25, 1991 date represents 180 days prior to the time Brinkley-Obu brought charges against HTI with the EEOC.

trial for either of two reasons: 1) the court did not abuse its discretion in denying the motion; or 2) the admission of the exhibits constituted harmless error. Under a harmless error analysis, Brinkley–Obu, as a beneficiary of the district court's error, would have the burden of showing that "the error almost surely did *not* affect the outcome of the case." *Id.* If Brinkley–Obu has satisfied this burden, the error would be considered harmless.

Considering the record as a whole, there is overwhelming evidence that HTI discriminated against Brinkley–Obu by paying her less than men who held comparable jobs. That evidence would have been sufficient without the graphs and charts submitted in Exhibits 5D and 35. The two exhibits in dispute "almost surely did not affect the outcome of the case." *Id.* If the district court's admission of the exhibits constituted error under *Lilly,* that error was harmless.

### Brinkley-Obu's Cross Appeal Issues

On cross-appeal, Brinkley–Obu raised two issues: 1) whether the court erred in denying her future salary relief calculated on the same basis that the jury had used in awarding her backpay; and 2) whether she was entitled to liquidated damages.

### Future Salary Relief

■ As part of its equitable powers under Title VII, a district court has broad equitable discretion to fashion remedies to make the plaintiff whole for injuries resulting from a violation of the statute. *Franks v. Bowman Transportation Co.,* 424 U.S. 747, 763–64, 96 S.Ct. 1251, 1264, 47 L.Ed.2d 444 (1976). Section 706(g) of Title VII, 42 U.S.C. § 2000e-5(g), vests broad equitable discretion in the federal courts to order such affirmative action as may be appropriate to remedy a violation including back pay and such other equitable relief as the court deems appropriate. *Id.* at 763, 96 S.Ct. at 1263–64. We review a district court's decision to deny requested prospective equitable relief for an abuse of discretion. *Taylor v. Home Ins. Co.,* 777 F.2d 849, 860 (4th Cir.1985), *cert. denied,* 476 U.S. 1142, 106 S.Ct. 2249, 90 L.Ed.2d 695 (1986).

■ Brinkley–Obu submits that the judge instructed the jury to calculate her back pay award measured by the difference between her salary and the average salary of the men in her department who were found to have performed equal work at higher pay (Parnes and Monseur). In the district court's initial prospective relief order, it ruled that her future salary should be adjusted by using the average male salary at her level ("OD"). Because the plaintiff is now the only "OD" level employee in her department (Parnes and Monseur have been demoted) and because the necessary evidence regarding other "OD" level employees at HTI was not in evidence, she requested the judge to reconsider his ruling in a post-verdict motion. She suggested that her future salary should be set as the average of Parnes and Monseur, the two men the jury found had been paid more for doing substantially equal work who were still employed at HTI. On reconsideration, the judge denied prospective relief altogether due to the lack of evidence in the record on which to calculate the requested relief.

Brinkley–Obu has argued that, based on the principles of issue preclusion and the Seventh Amendment, the judge was not at liberty to depart from the formula the jury used in computing back pay in order to determine her future relief. In her discussion of issue preclusion, plaintiff relied primarily on *E.E.O.C. v. Liggett & Myers Inc.,* 690 F.2d 1072, 1077 (4th Cir.1982), but *Liggett & Myers* deals only with the calculation of a back pay award. It has nothing to do with the equitable award of future relief. *Liggett & Myers* did hold that the proper male comparators in that calculation were those who, during the damage period, were proven to have performed equal work for higher pay. Plaintiff does not cite a case, however, for the proposition that the judge is bound by the back pay formula in his determination of additional equitable relief in the form of future salary adjustments. As HTI has noted in its brief, "[i]ssue preclusion has absolutely nothing to do with the ability of the District Court to award prospective relief in this case." The district court did not abuse its discretion in denying prospective relief based

on its conclusion that the relevant evidence was lacking in the record.

A lack of prospective relief, however, will leave the plaintiff with a series of new Equal Pay Act claims, accruing with each new paycheck subsequent to the date of this action, if Brinkley–Obu continues to be paid less than comparable male employees such as Monseur and Parnes. Our acceptance of the continuing violation theory indicates that HTI will continue to violate the Equal Pay Act until it begins to pay the plaintiff a higher salary in line with those of men who have performed the jobs she is now performing or comparable jobs.

### Liquidated Damages

■ Under 29 U.S.C. § 260, an employer in violation of the Equal Pay Act will be liable for liquidated damages, equal to and in addition to compensatory damages, unless the employer demonstrates to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or omission was not violative of the Act. Under 29 U.S.C. § 260, the district court has the discretion to decline to award liquidated damages when good faith is established. "This determination is subject to review for abuse of discretion." *Fowler v. Land Management Groupe, Inc.,* 978 F.2d 158, 163 (4th Cir.1992).

The language of the statute is mandatory. Although the judge has the discretion not to award damages, the statute "puts upon the 'delinquent employer [who would] ... escape the payment of liquidated damages [a] ... "plain and substantial burden of persuading

the court by proof that his failure to obey the statute was both in good faith and predicated upon such reasonable grounds that it would be unfair to impose upon him more than a compensatory verdict." ' " *Richard v. Marriott Corp.,* 549 F.2d 303, 306 (4th Cir.), *cert. denied,* 433 U.S. 915, 97 S.Ct. 2988, 53 L.Ed.2d 1100 (1977).

Brinkley–Obu presented evidence at trial that clearly established the discriminatory behavior of Smith, her first supervisor. She also introduced evidence, however, that subsequent supervisors, despite their failure to remedy her situation by paying her comparable wages, reacted to her complaints and made some effort to address her questions regarding her compensation. Brinkley–Obu sought and obtained salary reviews which occasionally resulted in increased wages. Her supervisors did studies, albeit inadequate, to support their actions with respect to the plaintiff. In addition, the record showed that Brinkley–Obu received occasional merit raises and some promotions.[37] None of this evidence negates the fact that HTI did not pay Brinkley–Obu wages comparable to those paid to her male co-workers or the fact that HTI did not promote her to the job grade she had earned, but it was evidence on which the district judge could base a finding of good faith.

In addition, the jury found that HTI's Equal Pay Act violation was not willful. In *Fowler,* we noted that a judge's findings on good faith do not have to be consistent with a jury's findings of willfulness, but a jury's finding of non-willful behavior can provide an objective basis on which a judge could premise a finding of good faith. The district court's order denying Brinkley–Obu liqui-

---

[37]. Brinkley–Obu's supervisors looked to national studies in order to ascertain the validity of plaintiff's salary. The 1992 ASQC Salary Survey, however, is a national publication for quality assurance personnel. Plaintiff has cited *Martin v. Cooper Elec. Supply Co.,* 940 F.2d 896, 910 (3d Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1473, 117 L.Ed.2d 617 (1992), for the proposition that the practice common to the industry is not a legitimate standard of comparison because an industry-wide practice does not imply a legal practice. That case, however, dealt with overtime. An industry-wide study of overtime has a greater chance of producing results skewed in favor of the industry than an industry-wide study

of quality assurance personnel has of producing results somehow skewed in favor of male employees.

Secondly, the relevant issue at HTI is what HTI was paying HTI's male employees. The fact that they were paying Brinkley–Obu a reasonable amount from the industry's perspective would not be at all relevant if they were paying her less than males performing comparable work at HTI. *Martin* suggests that the more appropriate inquiry for the company officials would have been whether they were paying Brinkley–Obu in accordance with the mandates of the Equal Pay Act.

**358**

dated damages did not constitute an abuse of discretion. Brinkley–Obu's appeal of that Order is, therefore, denied.

### Conclusion

In sum, we affirm the district court's order throughout, upholding the jury verdict, the denial of liquidated damages, and the denial of equitable relief.

*AFFIRMED.*