**Dora P. PETTIFORD, Plaintiff,**

v.

**NORTH CAROLINA DEPARTMENT OF HEALTH AND HUMAN SERVICES and Carol Donin, Defendants.**

No. 1:01CV485.

United States District Court, M.D. North Carolina.

July 22, 2002.

Joy Rhyne Webb, Browne Flebotte Wilson & Horn, P.L.L.C., Durham, NC, Olubayo O. Agbetunsin, Law Offices of James E., Hairston, Jr., Durham, NC, for Plaintiff.

Dora P. Pettiford, Butner, NC, pro se.

Thomas M. Woodward, Health and Human Services, N.C. Department of Justice, Raleigh, NC, for Defendant.

## MEMORANDUM OPINION

TILLEY, District Judge.

This case is now before the Court on Defendants' Motion to Dismiss Second Amended Complaint Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure or in the Alternative for Summary Judgment [Doc. # 28]. For the reasons set forth below, Defendants' Motion is GRANTED as to all claims except for retaliation based on complaints of racial discrimination and DENIED as to those claims.

### I.

The facts, in the light most favorable to the Plaintiff, Dora Pettiford, are as follows. In early August of 1998, Pettiford, an African–American female, applied for a position as Mental Health Program Consultant ("CAP consultant") with Defendant Department of Health and Human Service's ("DHHS") Division of Mental Health, Developmental Disabilities and Substance Abuse Services. The position was within the Division's Community Alternatives Program ("CAP") Branch and involved the review of treatment habilitation plans submitted for persons with mental and other developmental disabilities to ensure compliance with the CAP–MR/DD waiver under Medicaid Regulations. Upon reviewing the plans, a CAP Consultant makes recommended improvements and approves the plan when it complies with the Medicaid Regulations. CAP consultants also train area programs to help them remain in compliance with Medicaid.

Among other credentials and experience, Pettiford had a Bachelor's Degree in Public Administration from Shaw University

and a Master's Degree from North Carolina Central University. She also had 105 months of creditable state service and over 12 years of paid work experience in the mental health field. Part of this work experience included two years of experience working with a county program that assists CAP recipients but did not involve approving plans to insure compliance with the CAP–MR/DD waiver under Medicaid.

On December 2, 1998, Pettiford was offered the position to begin effective January 1, 1999 at an annual salary of $36,061. The offer also provided:

> You will serve a probation period of not less than three months or more than nine months. This period is considered an extension of the selection process, and provides time for a new employee to adjust effectively to a position. During this time, the supervisor will determine if the employee's performance is expected to meet acceptable standards. The employee will determine if he or she will be satisfied with the position. If either party concludes that expectations will be unmet, employment will be terminated without cause.

(Def's Mem. in Supp. of Mot. to Dismiss or for S.J. [Doc. # 33], Ex. E.)

When Pettiford was hired, the CAP branch had five Caucasian consultants reviewing plans and one African–American CAP consultant who provided training. Pettiford was the sixth consultant hired to review plans. She accepted the position and began work on January 4, 1999. Cynthia Kornegay was the Branch Head who hired Pettiford. Elizabeth Seitz was assigned as Pettiford's immediate supervisor, but on Pettiford's first day of work, Seitz informed her that she would be on emergency medical leave for up to six weeks. Pettiford states that she did not have an assigned supervisor from January 5, 1999 until February 9, 1999. Defendants contend that Kornegay acted as supervisor during this period.

Pettiford began orientation on January 4, 1999 and participated in further in-processing procedures on January 5 and 7, 1999. Pettiford was also required to participate in training as a new employee which she believed had no relevance to her job. Within a few weeks of her arrival, Pettiford began to feel hostility from other members of the department. By February 3, 1999 Pettiford determined that she was not receiving adequate feedback about her work and contacted Tara Larson, who was Kornegay's supervisor. Larson requested a detailed assessment from Pettiford about her training and employment needs, and upon receipt of the list, Larson met with Kornegay about the concerns. Kornegay then reprimanded Pettiford for going outside the chain of command about her complaints. Kornegay instructed Pettiford to contact her immediate supervisor with problems. Kornegay also assigned Carol Donin, a newly hired supervisor who is Caucasian, as Pettiford's direct supervisor. Sharon Wellman was hired for training matters. Pettiford expressed concern over having to report to two supervisors. According to Pettiford, Kornegay reacted in an unfriendly, hostile manner but agreed that Pettiford would report only to Donin for all matters. Donin had not begun work with DHHS on February 1, 1999, but had reviewed CAP plans in previous jobs and ultimately became the supervisor for all CAP consultants. Kornegay also directed Pettiford to repeat the new employee training because Pettiford had indicated a need for more training and had missed some of the January sessions when she first started the job.

On February 5, 1999, Defendant Donin met with Pettiford about questions and work expectations, and advised Pettiford that all work-related questions were to be

addressed to her. Donin also discussed an upcoming CAP–MR/DD conference being held in March 1999 and provided Pettiford with a schedule of sessions. Pettiford was to indicate which sessions she wished to attend and return the schedule to Donin for review.

Pettiford had attended past CAP–MR/DD conferences on several other occasions prior to her new position as CAP consultant. She had not only participated in these conferences, but served as a panel speaker on retirement and disability in 1997. As a result, Pettiford believed she was capable of selecting appropriate sessions at the conference and also hoped to have time to network with other participants. Pettiford filled out her conference slots and left the form on her desk. According to Pettiford, Donin removed the form from Pettiford's office without permission and changed her selections for conference slots. Donin states that she did change Pettiford's selections in order to maximize Pettiford's time and training at the conference. Pettiford went to Donin upset about the changes and complained that the white consultants were not required to attend the conference as participants. Defendants contend that all of the white consultants were already permanent employees. As a result of being required to attend the conference all day as a participant, Pettiford was unable to obtain necessary information relevant to her job from other conference participants.

Donin had formal supervisory meetings with Pettiford beginning in early February and kept written notes of the meetings. According to Donin's supervisory notes, Donin told Pettiford during a supervisory meeting on February 24, 1999 that the CAP consultants should strive to complete ten plans per day. This goal had been discussed by Donin, Larson, and Kornegay in an attempt to decrease the backlog of plans needing approval. Donin, Larson and Kornegay all had experience reviewing plans and felt this was a reasonable expectation. Defendants contend that this goal was mentioned at a staff meeting which was held around the same time period. According to the supervision notes, Pettiford was not comfortable with the goal, and replied to Donin that productivity requirements would jeopardize her ability to be accurate. The following day, in the context of the previous days' discussion, Pettiford relayed to Donin that she had not had difficulty with supervisors before, and that perhaps her difficulty with Donin was due to "cultural differences." Donin replied that she had worked with people of various ethnic, racial, and socioeconomic backgrounds and had not had any difficulties with her relationships with them. According to the notes, Pettiford indicated that her own directness in communicating with others was a possible reason for the problem. The records indicate that written evaluations stopped after this point until April.

On March 25, 1999, Pettiford e-mailed Kornegay and Larson, stating in part, "I am seeking an answer or answers to the question 'Why am I receiving differential treatment on this job?'... Confrontations with management staff have been unpleasant and unwarranted.... Conditions of work that I have been subjected to have the appearance of those that are race based in nature. In order for me to work effectively, ... the disparate treatment ... must end." Pettiford provided an agenda with her concerns and instances of disparate treatment upon the request of Larson. These concerns included her belief that she had suffered from differential treatment as evidenced by the Defendants' failure to give her a job description, Defendants' requirement that she attend training that was not relevant to her job, and the fact that Cindy Kornegay had not communicated with her at all during her first

month at work that she had to request a job description one month after beginning work and that she did not feel like part of "the team." Pettiford provided other specific incidents which she believed were indicative of discrimination, including her observation that she was required to write contact notes when communicating with area programs staff while white employees were not required to write these notes, her observation that Cindy Kornegay showed "courtesy and support" to a new white employee but had not extended the same "courtesy and support" to Pettiford when she arrived, and that an overall atmosphere of friendliness and respect existed with respect to white management staff and support staff while she did not benefit from this friendly atmosphere.

Larson agreed to investigate Pettiford's concerns and provide her with a response within approximately two weeks. In her written response to Pettiford's concerns, dated April 9, 1999, Larson summarized Pettiford's concerns of racism evidenced by a lack of feedback on her work performance and unpleasant confrontations with supervisory staff. Larson's investigation included: Pettiford's outline of specific incidents which she believed were indicative of racism; the meeting with Pettiford, Donin, and Kornegay; interviews with Donin, Kornegay, and four other CAP–MR/DD branch staff; a review of supervisory/ personnel records of five CAP–Branch staff; a review of probationary records of Branch staff since 1994, as well as training and orientation procedures for current and past Branch employees; and a review of a random selection of Pettiford's assigned charts as well as charts processed by other consultants. As a result of her investigation, Larson wrote to Pettiford:

"Through review of practice, supervision records, and interviews, I have found no evidence to suggest that supervisory actions have been racially motivated. I also found that you had received feed-back regarding your job performance. The information that you provided to me as well as the information I reviewed indicates that you have not always agreed with the feedback you were given."

(Def's Mem. in Supp. of Mot. to Dismiss or for S.J, [Doc. # 33], Ex. O.)

As a result of the investigation, Larson directed that Donin and Pettiford complete a detailed "work development plan/contract which will outline in specific detail job duties which need to be addressed, the method [by which] you will receive feedback per job duty, and the schedule for formal face to face supervision." (Def's Mem. in Supp. of Mot. to Dimiss or for S.J, [Doc. # 33], Ex. O.) Larson stated that acceptance of feedback would be one of the items addressed on the development plan, and that the face-to-face supervision meetings would provide Pettiford with the reason she remained on probationary status.

Pettiford's initial Development Plan, dated and signed on April 26, 1999, stated that Pettiford would receive weekly supervision and that supervision notes would be signed by Pettiford and Donin, that Pettiford would received written and oral feedback on all work submitted to Donin for review, and that "oral communication between Dora and Carol will be conducted in a professional manner with both parties having the opportunity to completely express their questions, responses, comments, and concerns without interruption." (Def's Mem. in Supp. of Mot. to Dismiss or for S.J. [Doc. # 33], Ex. P.)

In or before June of 1999, Pettiford submitted an application for a position entitled "Human Services Plan Evaluator IV," also with the DHHS. The position was first posted on May 13, 1999 and Pettiford qualified according to the required training and experience listed on the posting. The same position was again posted on May 27,

1999, August 5, 1999, and September 16, 1999. Pettiford interviewed for the position on June 29, 1999 and received a letter of rejection on June 7, 2000. Pettiford wrote a response to the rejection letter, requesting the following information: 1) the reason for the year long delay in responding to her application; 2) the qualifications of the selectee who was a better match for the position; and 3) which of the three job postings was used to recruit the selectee. Pettiford received a response from Phillip Bickham, the Personnel Manager for DHHS, on July 11, 2000, stating that: 1) the position had been posted several times and finally closed on November 11, 1999 and the position was filled in March 2000; 2) the selected candidate's qualifications are confidential information; and 3) the application of the selected candidate was received in October 1999.

On July 26, 1999, an Addendum to the Development Plan was prepared for Pettiford. The Addendum first discussed "Progress on Development Plan of 4/21/99" and stated that "Dora's skills in the areas of analysis and attention to detail have progressed over the past few months and she has attained a higher level of independence in her work." (D's exhibit P) The Addendum then discussed two concerns: inability to accept supervision and low productivity. As a "Necessary Action" to take concerning Pettiford's inability to accept supervision, the Plan states "Dora will consistently refrain from stating to Carol that differences of opinion are due to cultural differences by October 1, 1999." (Def's Mem. in Supp. of Mot. to Dismiss or for S.J. [Doc. # 33], Ex. P.)

Pettiford prepared a rebuttal to the plan and submitted it to Donin, noting that the Development Plan and the Addendum to the Development Plan insinuated that she had work skills in need of improvement. In the rebuttal, Pettiford stated: "CAP–MR/DD Branch Management staff has never identified any problems with my work performance. My work skills were never in need of improvement, which negates the need for a Development Plan, or a revised Development Plan." Pettiford referred to DHHS Directive Number 34, which identifies the Development Plan as a course of action to be taken to improve an employee's performance, and stated, "it appears to me that the Addendum of 7–26–99 was written in pretense as a cover for the Development Plan of 4–26–99 that was not necessary in the first place. This action constitutes fraud on the part of CAP Branch management staff." Pettiford denied "any difficulty in accepting feedback, or in the inability to accept supervision from Carol Donin, supervisor. If I have displayed any reluctance to feedback or supervision, it is because I have not felt that I could trust her instruction/feedback." (Def's Mem. in Supp. of Mot. to Dismiss or for S.J. [Doc. # 33], Ex. P.) With respect to the comments about low productivity, Pettiford replied,

> I was not informed prior to entrance on duty at the CAP–MR/DD Branch that my work was production-based. My job description does not address or specify a requirement or expectation of 10 activities/day.... Carol Donin, supervisor, has consistently portrayed me in a negative manner, and with an air of flagrance. Her portrayal and perceptions of me are grossly inaccurate, and defines a person of authority who lacks objectivity and fairness in assessment of others, particularly those of color, and who abuses authority.

(Def's Mem. in Supp. of Mot. to Dismiss or for S.J. [Doc. # 33], Ex. P.)

Pettiford further stated that she had "been denied permanent employment status in [her] position ... in [her] belief, due to racial/job discrimination," and was "requesting a review by the North Carolina

Office of State Personnel." (Def's Mem. in Supp. of Mot. to Dismiss or for S.J. [Doc. # 33], Ex. P.)

On August 26, 1999, one month after the Addendum to the Developmental Plan and her rebuttal, Pettiford received Addendum # 2 to the Developmental Plan, which noted no improvements and addressed Pettiford's inability to accept supervision as the only "current behavior" requiring action. In the remarks, Donin stated,

Dora indicated that she was going to the [Office of Administrative Hearings] today to request a new supervisor.... It was explained to Dora that one of the items on her developmental plan is to demonstrate acceptance of feedback from her supervisor. At this point, Dora stated again that she is going to take this up with the [Office of Administrative Hearings] today and terminated the meeting by leaving Carol's office.

(Def's Mem. in Supp. of Mot. to Dismiss or for S.J. [Doc. # 33], Ex. R.)

In response to the behavior issues, the Addendum changed the October 1, 1999 date for compliance with "necessary action" to "effective immediately," providing: "effective immediately, Dora will consistently refrain from stating to Carol that differences of opinion are due to cultural differences." (Def's Mem. in Supp. of Mot. to Dismiss or for S.J. [Doc. # 33], Ex. R.) Pettiford refused to sign the Addendum. In the supervision notes for the day, Donin noted: "Dora said she was going to [the

Office of Administrative Hearings] today." The following day, August 27, Pettiford wrote to John Baggett, the Director of the North Carolina Department of Health and Human Services, requesting a transfer due to racial discrimination by her supervisor, Carol Donin, and informed Baggett she had filed a discrimination complaint with the EEOC on July 20, 1999 that had been forwarded to the Office of Administrative Hearings.[1] On September 23, 1999, Baggett denied Pettiford's request for a transfer, inaccurately stating that Pettiford's problems with two prior supervisors made it unlikely that a third supervisor would solve the problem.[2] Pettiford sent Baggett a response to the denial, pointing out the inaccurate information, but did not receive a response.

In the supervision notes for September 10, 1999, Donin wrote, "Cindy [Kornegay] indicated that we are nearing end of probationary period. Need to see immediate improvement to be recommended for permanent status." The notes are not signed by Pettiford; instead, there is a line stating "employee chose not to sign." (Pl's Br. in Opp'n to Def's Mot. to Dismiss or for S.J. [Doc. # 46], Ex. 28.)

On September 30, 1999, Pettiford received a formal letter of dismissal stating that her dismissal was based on "unacceptably low" productivity and that Pettiford "continued to display the inability to accept supervision." (Def's Br. in Supp. of Mot. to Dismiss or for S.J. [Doc. # 33], Ex.

---

1. The record indicates that Pettiford's complaint with the EEOC was forwarded to the North Carolina Office of Administrative Hearings sometime after July 20, 1999. The record does not indicate that the Defendants were aware that the charges had definitely been filed until sometime between August 27, 1999, when Pettiford wrote to Dr. Baggett and informed him that the EEOC charges had been filed on July 29, 1999 and forwarded to the Office of Administrative Hearings, and September 23, 1999, when Dr. Baggett re-

sponded to her letter. Prior to that time, Pettiford had indicated in a supervisory meeting with Defendant Donin on August 13, 1999 that she intended to file a complaint with the Office of Administrative Hearings. On August 26, 1999, she informed Donin that she was leaving Donin's office to attend a meeting with the Office of Administrative Hearings.

2. The two prior supervisors Baggett referred to were Laura Seitz and Carol Donin; however, Seitz only supervised Pettiford for one day.

U.) The letter notes that Pettiford was given the opportunity to correct the behavior through the development plan, but "problems persisted."

Plaintiff filed a complaint in this matter alleging the following: 1) Defendants violated the Equal Pay Act and Title VII by paying male employees higher salaries for the same position (claims one and six); 2) DHHS failed to prevent discrimination, thereby creating a hostile work environment (claim two); 3) retaliation under Title VII for her opposition to racial and sex discrimination in violation of Title VII (claim three); 4) Defendants violated the North Carolina Equal Employment Practices Act (claim four); and 5) Defendants' negligence caused severe emotional distress (claim five).

## II.

Federal Rule of Civil Procedure 12(b) states, in part,

> [i]f, on a motion asserting the defense numbered (6) [failure to state a claim upon which relief can be granted], matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.

Defendants submitted a "Motion to Dismiss Second Amended Complaint or, in the Alternative, for Summary Judgment." With this motion, Defendants submitted numerous exhibits. Plaintiff also submitted exhibits in conjunction with her response to Defendants' motions. Discovery in this case is closed, and a summary judgment determination is appropriate at this point in the proceedings.

## III.

Summary judgment is only proper when, viewing the facts in the light most favorable to the non-moving party, there is no genuine issue of any material fact and the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(e); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Murrell v. Ocean Mecca Motel, Inc.,* 262 F.3d 253, 255 (4th Cir.2001); *Cox v. County of Prince William,* 249 F.3d 295, 299 (4th Cir.2001). Summary judgment requires a determination of the sufficiency of the evidence, not a weighing of the evidence. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). An issue is genuine if a reasonable jury, based on the evidence, could find in favor of the non-moving party. *Id.* at 248, 106 S.Ct. at 2510; *Cox* 249 F.3d at 299. The materiality of a fact depends on whether the existence of the fact could cause a jury to reach different outcomes. *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510, 91 L.Ed.2d at 206; *Cox,* 249 F.3d at 299; *Solers, Inc. v. Hartford Cas. Ins. Co.,* 146 F.Supp.2d 785, 791 (E.D.Va.2001). A party opposing the motion may not rest upon the pleadings but must instead provide evidence or point to evidence already on the record that would be sufficient to support a jury verdict in her favor. *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510, 91 L.Ed.2d at 206. This evidence must be properly authenticated pursuant to Rule 56(e). *Orsi v. Kirkwood,* 999 F.2d 86, 92 (4th Cir.1993). Furthermore, even where intent and motive are crucial to determining the outcome of the cause of action, conclusory allegations and unsupported speculation are insufficient to withstand summary judgment review. *See Evans v. Techs. Applications & Serv. Co.,* 80 F.3d 954, 960 (4th Cir.1996); *Cross v. Bally's Health & Tennis Corp.,* 945 F.Supp. 883 (D.Md.1996).

## IV.

Pettiford alleges that, as a female, she was paid a lower salary than three, less-qualified males in comparable positions in violation of Title VII and the Equal Pay Act. Under both the Equal Pay Act and Title VII, a plaintiff must show a prima facie case of discrimination. *Brinkley–Obu v. Hughes Training, Inc.*, 36 F.3d 336 (4th Cir.1994). The standards under the Equal Pay Act and Title VII are slightly different. Under the Equal Pay Act, a plaintiff must show that the employer paid "different wages to employees of opposite sexes for equal work in jobs which require equal skill, effort, and responsibility, and which are performed under similar working conditions." *Brinkley–Obu*, 36 F.3d at 343. Under Title VII a plaintiff need only show that "'the job she occupied was similar to higher paying jobs occupied by males,'" a burden which is less stringent that the Equal Pay Act requirement. *Brinkley–Obu*, 36 F.3d at 343 (citation omitted). Put another way, a Title VII claimant can establish a prima facie case by showing she is a member of a protected class (female), and that the job she occupied was similar to higher paying jobs occupied by males. *Id.* at 343. Once a claimant has established a prima facie case under either, the burden then shifts to the employer to put forth a legitimate reason for the disparity. Under the Equal Pay Act, the defendant has a burden of production and persuasion and has to demonstrate that the wage differential was caused by "any factor other than sex." *Id.* at 344. If the defendant cannot meet this burden, the plaintiff must win. Under Title VII, the burden is only of production; then the burden shifts back to the plaintiff to show that the proffered reason for the disparity is pretext for discrimination.

Pettiford identifies John Sullivan, Gerald Walton, and Steve Cherry as males employed as Mental Health Program Consultants with Defendant DHHS who allegedly receive more pay for equal work. The only information in the record is not helpful to Ms. Pettiford's case. It shows that Sullivan began work in July of 1996 at a salary of $35,698 and Cherry began work in May of 1999 at $35,775. Defendants state that Sullivan's salary was higher than Pettiford's when she started work because he had received raises in the two and a half years he had been working there. Therefore, Ms. Pettiford cannot establish a prima facie case with respect to these two consultants. Pettiford does provide Walton's offer letter, which gives a starting salary of $38,002 for the position of Mental Health Program Consultant. Defendants do not dispute that the job requirements were at least equal. Pettiford has, therefore, established a prima facie case under Title VII and the Equal Pay Act by showing that she is a member of a protected class and that the job she occupied required equal skill, effort, and responsibility, and was performed under similar working conditions to the job occupied by Walton. Defendants, however, have offered the affidavit of Phillip Bickham which states that Jerry Walton was already a Division employee when he applied for the position as Mental Health Program Consultant, and transferred laterally to the CAP branch. Because his transfer was lateral, he was able to retain his salary from his former position. In response, Pettiford submits that Walton's offer letter shows that he would be placed on probationary status from three to nine months, and therefore the Defendants' contention that the transfer was lateral is false. Defendants state in response that the letter was a form letter. Regardless of Walton's status as a probationary employee or permanent employee, Pettiford has provided no evidence which suggests that Walton's salary was not related to the fact that he was receiving that higher sala-

ry in another department with DHHS and that his higher salary with the Defendants was due to a lateral transfer. Pettiford has therefore not created a reasonable inference of gender discrimination under Title VII and the Equal Pay Act.[3]

## V.

Pettiford alleges that Defendants did not make her a permanent employee at the end of her probationary period because of racial discrimination. She further contends that she was subjected to disparate treatment while employed by the Defendants and that Defendant DHHS's failure to stop such discrimination resulted in a hostile work environment. These claims will be addressed in turn.

■ Under a Title VII claim for discriminatory discharge, a plaintiff may provide direct evidence of discrimination, such as "conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision," or, in the absence of such direct evidence, the plaintiff may proceed using circumstantial evidence under the burden-shifting proof scheme established by the Supreme Court in

*McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *Taylor v. Virginia Union University,* 193 F.3d 219, 232 (4th Cir.1999).

■ Pettiford does not provide any evidence which "reflect[s] directly the alleged discriminatory attitude and bear[s] directly on the contested employment decision" with respect to the Defendants other than as it relates to her retaliation claims based on her objections to racial discrimination. *Id.* at 230.[4] Therefore, as to this claim, she must proceed under *McDonnell Douglas.* Under *McDonnell Douglas,* a plaintiff's prima facie case of discrimination creates an inference that the employment action was based on unlawful discrimination. If the plaintiff can establish a prima facie case, the employer must then give a legitimate, nondiscriminatory reason for its action in order to rebut that inference. *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824, 36 L.Ed.2d at 678. If the employer presents such a reason, the plaintiff can still prove discrimination by showing that the stated reason is a mere pretext for a decision motivated by discrimination. *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 143, 120

---

**3.** Pettiford offers other arguments to support her position which are not persuasive here. She alleges that Walton and Cherry were only assigned to between zero and three area programs during first month of employment, while she was assigned to six programs, but offers no evidence to support the contention nor any evidence showing that the program sizes were equal. She also alleges that Cherry and Walton's supervision meetings were on a less frequent basis and that they were not required to sign their evaluations, but does not offer any evidence other than her assertion that they gave her such information. She also states that Sullivan was not placed on a development plan and was not terminated for failing to complete ten plans per day, but again does not provide any documentation or affidavits to support her contention. The consideration of Pettiford's proffered evidence here is notwithstanding the fact that

she had no evidence of a pay disparity except with Walton and no evidence that he was not a lateral transfer.

**4.** Pettiford contends that the Addenda to the Development Plan and the Defendants' statement that Pettiford refrain from discussing "cultural differences" is discriminatory on its face. However, the Addenda are more appropriately discussed in the context of Pettiford's retaliation case. It was she who initiated the mention of cultural differences and racial discrimination. There is no evidence in the record that she was dismissed because of her race or because of cultural differences. This evidence, therefore, bears on whether the Defendants retaliated against her for raising the issue, and not on whether the Defendants believed that cultural differences warranted her dismissal.

S.Ct. 2097, 147 L.Ed.2d 105 (2000); *McDonnell Douglas*, 411 U.S. at 804, 93 S.Ct. at 1825, 36 L.Ed.2d at 679. To establish a prima facie case of discrimination in the context of discriminatory discharge, Pettiford must show: 1) she is a member of a protected class; 2) she suffered an adverse employment action; 3) at the time of the adverse employment action, she was performing at a level that met the Defendants' legitimate job expectations; and 4) the position was filled by a similarly qualified applicant outside the protected class. *Brinkley v. Harbour Recreation Club*, 180 F.3d 598, 607 (4th Cir.1999). Other circumstances giving rise to an inference of unlawful discrimination may also be used to satisfy the fourth prong. *E.E.O.C. v. Sears Roebuck & Co.*, 243 F.3d 846, 851 n. 2 (4th Cir.2001) (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)).

■ While "[t]he burden of establishing a prima facie case of disparate treatment is not onerous," *Evans*, 80 F.3d at 959–60 (citing *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)), Pettiford has not shown that she was performing at a level that met the Defendants' legitimate job expectations and therefore, her prima facie case fails. Defendants have produced the written supervision notes taken during Pettiford's period of employment as well as affidavits and depositions from her supervisors. These documents discuss the Defendants' expectation that employees strive for completing and approving an average of ten plans per day and Pettiford's continued shortfall in meeting those expectations. These numbers showed that Pettiford fell far short of the ten-plan-per-day goal. The documents also show an extremely contentious relationship between Donin and Pettiford. In the supervision notes, which Pettiford signed as having read until August 31, 1999,[5] Donin relates many instances when her feedback led to heated arguments, in some cases ending with Pettiford simply walking out of Donin's office.

Pettiford responds with no evidence to the contrary. She acknowledges that the ten-plan-per-day goal was relayed to her in a meeting with Donin on February 24, 1999. She provides numerous reasons for her failure to meet the ten plan goal, but no evidence that she was actually close to that number. Pettiford claims that the goal was not in writing and not part of the work description given to her when she applied for the job. The record indicates, however, and Pettiford does not dispute, that reviewing plans was an important part of her job. Furthermore, the three women who established the goal had all worked with these types of plans and felt the goal was reasonable. Pettiford presents a memo signed by eight employees which includes a complaint that "the productivity information was dumped on us with no opportunity to respond," but Defendants have submitted affidavits from the employees' supervisors stating that everyone but Pettiford was able to meet the goal on a consistent basis. The document also shows that all employees were given a productivity requirement, not just Pettiford. Moreover, the numbers submitted by the Defendants indicate that Pettiford was nowhere near the goal; in fact, she was only averaging four plans per day when she was dismissed.

Pettiford submits that she was overly supervised and that the supervisory meetings took away from her ability to complete her work. In her deposition,

---

5. Pettiford alleges, but does not produce evidence, that white employees were not required to sign their supervision notes. She stopped signing them on August 31, 1999, when she believed she had been signing them unnecessarily.

Pettiford estimated that her weekly supervisory meetings took an average of one half hour to one hour in length, sometimes more. She provides no evidence that the meetings lasted long enough or were frequent enough to prevent her from doing half of the work she was asked to do. Pettiford also contends that she was in charge of more area programs than other employees and therefore her productivity numbers were low. However, she provides no evidence to support her statement.[6] Pettiford also submits Donin's statement in her deposition that Pettiford was a hard worker who was always at her desk working when Donin walked by. That she was working, however, does not mean she was accomplishing required objectives. Notwithstanding the documentation of contentious interactions with Donin and the Defendants' allegations of unacceptable personal conduct related to Pettiford's inability to accept supervision, Pettiford has not proffered authenticated evidence, admissible at trial, which supports a reasonable inference that she was meeting her employer's legitimate expectations.

 Instead of providing evidence that she was meeting the Defendants' legitimate work expectations, Pettiford discusses incidences which occurred during her employment that she believes are indicative of racism. Even if Pettiford had made a prima facie showing, however, the incidents discussed below would not be sufficient to support a reasonable inference that the Defendants' stated reasons are pretext for racial discrimination. First, Pettiford contends that Donin's selection of conference slots at the March 1999 CAP conference and the requirement that she attend the conference all day as partici-

pant were racially motivated. She offers only her own conclusion that the requirement that she participate in that capacity was for any reason other than the fact that she was a new employee. While Pettiford had attended the conference in the past and had participated as a speaker, she does not contest the fact that she had never performed the function of reviewing and approving CAP plans. She simply speculates that she was required to attend the conference as a participant because of her race.

Pettiford also contends that the Development Plan she was placed on by Tara Larson was without just cause because Development Plans are generally used when employees' work performance is unsatisfactory, and Pettiford had not been informed of any areas of work performance that needed improvement. The undisputed facts show, however, that Pettiford requested more supervision and complained that the Defendants' failure to supervise her initially was racially motivated. Larson's response to the complaint was to provide a more structured way of providing feedback to Pettiford. Nothing in the record shows that the Development Plan was initiated for any other reason.

Pettiford also contends that she was required to attend weekly supervision meetings with Donin, while white consultants were not required to attend weekly meetings. Donin acknowledges that other employees, white and black, were not required to attend weekly meetings but states that this is because they had not requested more training and feedback. Pettiford provides no evidence that the frequency of supervision was for any rea-

---

**6.** Pettiford provides a document that looks like area assignments for CAP consultants; however, the document has not been authenticated. Even if the document were authenti-

cated, however, it does not support Pettiford's contention that she had a disproportionate number of areas compared to other consultants.

son other than the fact that she asked for a more clear description of the Defendants' expectations of her.

Pettiford states that Larson refused to acknowledge and end disparate treatment relating to her. She acknowledges that Larson agreed to meet with her when she first complained of racism in March of 1999, and that Larson listened to her concerns. She provides no evidence that the investigation Larson undertook in response to those concerns was not genuine or that Larson did not take her concerns seriously. Pettiford's only argument in support of that contention is that Larson did not find, after her investigation, that she was being treated differently.

Finally, Pettiford alleges that Dr. Baggett's denial of her transfer was based on false information given to him by Ms. Larson. Defendants admit that Dr. Bagget's letter contains an incorrect statement stating Pettiford had problems with supervision by Seitz, because Seitz was her supervisor for only one day. That misinformation was contained in a letter sent directly to Ms. Pettiford and was quickly brought to Dr. Baggett's attention by Ms. Pettiford.

▇▇▇ Pettiford provides all of the above arguments in support of her contention that the Defendants' reason for terminating her was pretextual. However, none of the evidence discussed above shows that the Defendants' stated reasons for dismissing her were false, or that they were not the true reason for the dismissal. *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 648 (4th Cir.2002) ("[A] valid way to prove pretext is to provide evidence that the employer's proffered reason was not the actual reason relied on, but was rather a false description of its reasoning ... manufactured after the fact."). All Pettiford has shown is that she disagrees with the Defendants' assessment of her abilities and that she had a strained personal relationship with Donin. Neither of these showings are sufficient to establish pretext. *Hawkins*, 203 F.3d 274 (4th Cir. 2000) (stating in context of § 1981 action that a "showing of a difference of opinion, coupled with [a plaintiff's] conclusory allegations of racism, cannot reasonably support the conclusion that [the plaintiff's] discharge was motivated by racial animus); *DeJarnette v. Corning, Inc.*, 133 F.3d 293, 299 (4th Cir.1998) (stating "it is not our province to decide whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason·for the plaintiff's termination" and that in a wrongful discharge action, "it is the perception of the decision maker which is relevant, not the self-assessment of the plaintiff"). Pettiford merely speculates as to the meaning of the events discussed above. " '[A] plaintiff's own assertions of discrimination in and of themselves are insufficient to counter substantial evidence of legitimate nondiscriminatory reasons for an adverse employment action.' " *Hawkins v. PepsiCo, Inc.*, 203 F.3d 274 (4th Cir.2000).

Pettiford also contends that the evidence discussed above shows disparate treatment. Claims of disparate treatment are also analyzed under *McDonnell Douglas*. *Cook v. CSX Trans. Corp.*, 988 F.2d 507, 511 (4th Cir.1993); *Erskine v. Bd. of Educ.*, 197 F.Supp.2d 399, 405–06 (D.Md. 2002); *Worster v. United States Postal Serv.*, 132 F.Supp.2d 397, 406 (M.D.N.C. 2001), *aff'd* 28 Fed. Appx. 324, 2002 WL 242348 (4th Cir. Feb. 20, 2002) (unpublished). Because Pettiford provides no different evidence for this claim, it must fail for the reasons stated above.

▇▇▇ Also connected to Pettiford's discrimination claim is her claim that DHHS created a hostile work environment by failing to stop the discrimination. To withstand DHHS's summary judgment motion

on this claim, Pettiford must establish that a reasonable jury could find her harassment "(1) unwelcome; (2) based on race; ... (3) sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere;" and (4) that there is a basis to impute liability to DHHS. *Spriggs v. Diamond Auto Glass,* 242 F.3d 179, 183–84 (4th Cir.2001). The conduct at issue must be so severe and pervasive as to create an abusive work environment that could affect the mental state of a reasonable person. *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993); *Hawkins,* 203 F.3d at 281; *White v. Federal Express Corp.,* 939 F.2d 157, 160–61 (4th Cir.1991). In addition to the above allegations, Pettiford contends that she was given different terms and conditions of employment than her white co-workers, that her supervisors, particularly Donin, communicated with her differently than with her white co-workers, that she was given different instructions and assignments than her white co-workers, and that the Defendants did not retain her because she failed to meet an "expressed but not written" work requirement.

Pettiford provides no evidence that these allegations are true. She provides no evidence that the ten-plan-per-day goal was not established for all employees. She contends that her supervisors had a "hostile attitude," as noted in her agenda for the March 29, 1999 meeting when she complained, "I have not received the same positive communication, display of respect, or overall friendliness as the White consultants." (Pl's. Br. in Opp'n to Def's Mot. to Dismiss or for S.J. [Doc. # 46], Ex. 21.) Her Agenda recounts several conversations where directions and orders relating to Pettiford's work are allegedly given in an unfriendly tone, but Pettiford provides no evidence that the incidents are related to feelings about her race. In fact, even if Donin did not like Pettiford personally,

causing Pettiford's job to be more "difficult or stressful, 'an employer is not required to like his employees.'" *Hawkins,* 203 F.3d at 281 (quoting *Williams v. Cerberonics, Inc.,* 871 F.2d 452, 457 (4th Cir.1989)). In all, Pettiford has provided no evidence of a hostile work environment and this claim must also fail.

## VI.

 Pettiford contends that she was not selected for the Human Services Planner Evaluator IV position with the Mental Health, Developmental Disabilities and Substance Abuse Services in retaliation for the initial complaint she submitted to Larson on March 25, 1999. She also alleges that she was terminated in retaliation for her informal and formal complaints of discrimination.

 Two types of activities are protected under 42 U.S.C. § 2000e–3: participation activity and opposition activity. Ms. Pettiford engaged in both. Participation occurs when an employee makes a charge of discrimination or testifies or participates in a Title VII investigation, proceeding or hearing. *Kubicko v. Ogden Logistics Servs.,* 181 F.3d 544, 551 (4th Cir.1999). Protected activity under the opposition clause includes "utilizing informal grievance procedures as well as staging informal protests and voicing one's opinions in order to bring attention to an employer's discriminatory activities." *Laughlin v. Metro. Washington Airports Auth.,* 149 F.3d 253, 259 (4th Cir.1998). When an employee engages in opposition activity, courts employ a balancing test in which the purpose of Title VII is weighed against the ability of employers to objectively select and control the workforce. *Kubicko,* 181 F.3d at 551. The Fourth Circuit has held that "under this balancing test, as long as an employee complains to his or her employer or participates in an

employer's informal grievance procedure in an orderly and nondisruptive manner, the employee's activities are entitled to protection under § 704's opposition clause." *Id.*

Based upon the evidence concerning Ms. Pettiford's complaints and allegations of racism and how these complaints overlap with her assertions that her personal differences with Donin are due to "cultural differences," it cannot be concluded that Pettiford's complaints should not be protected under the opposition clause. The evidence in the record shows that Pettiford took several opportunities to respond in writing to the discrimination she felt was occurring. She further sought assistance from upper management by requesting a new supervisor. Other than these written complaints that her differences with Carol Donin relate to race and cultural differences, the record is unclear concerning how disruptive Pettiford's assertions were. According to the supervision notes, written by Donin, Donin and Pettiford engaged in several heated conversations where the topic of cultural differences was raised often by Pettiford. However, the Defendants in this case have not made a showing that Pettiford's complaints were disruptive. Her behavior as displayed in the supervision notes does not rise to the level of behavior which has been found by courts to be unprotected by Title VII. *See Robbins v. Jefferson Co. Sch. Dist. R–1, et al.*, 186 F.3d 1253, 1259 (10th Cir.1999) (finding activity not protected when plaintiff "lodged frequent, voluminous, and sometimes specious complaints" and engaged in antagonistic behavior toward her superiors); *Rollins v. State of Fl. Dept. of Law Enforcement*, 868 F.2d 397 (finding, under different proof scheme, that plaintiff's behavior was a legitimate reason for termination when she refused to follow prescribed avenues for lodging complaints, wrote grievances on her time sheets, and number and where supervisor testified

that complaining had "damaging effect on morale"); *Hochstadt v. Worcester Found. for Experimental Biology et al.*, 545 F.2d 222, 224 (1st Cir.1976) (finding no protection for plaintiff whose "actions over the previous three and one-half years demonstrated that her colleagues ... could not work successfully with her; research assistants ... were unhappy and left the foundation ... senior scientists ... complained that her behavior impeded their research ... and the director and assistant director had found it impossible to reach any compromise ..."); *McNair v. Computer Data Sys., Inc.*, 98–1110, 1999 WL 30959, 1999 U.S.App. LEXIS 1017 (4th Cir. Jan. 26, 1999) (unpublished opinion) (finding no protection for plaintiff's complaints to employer's clients regarding race and sex discrimination); *Kator v. Doctors Band, Badwey, Goodridge and Perez, P.A.*, No. 96–2539, 1998 WL 7942, 1998 U.S.App. LEXIS 428 (4th Cir. Jan. 13, 1998) (unpublished opinion) (finding no Title VII protection for systematically calling patients and reporting discrimination issues). Since the Fourth Circuit favors a judicial balancing of " 'the purpose of [Title VII] to protect persons engaging reasonably in activities opposing ... discrimination against Congress's equally manifest desire not to tie the hands of employers in the objective selection and control of personnel,' " *Kubicko*, 181 F.3d at 551 (quoting *Laughlin*, 149 F.3d at 259), the Defendants have not met their burden and the balancing must weigh in favor of the Plaintiff.

Pettiford also engaged in participation activity, which is protected activity under Title VII, when she filed her complaint with the Office of Administrative Hearings. *Laughlin v. Metropolitan Washington Airports Auth.*, 149 F.3d 253 (4th Cir.1998) ("Activities under the participation clause are essential to 'the machinery set up by Title VII.' As such, the scope of protection for activity falling under the participation clause is broader than for activity falling

under the opposition clause." (citations omitted)). Once she has shown that she engaged in protected activity, Pettiford must also show that her employer took an adverse employment action against her and that there was a causal connection between the two events in order to establish a prima facie case. *Anderson v. GDC, Inc.,* 281 F.3d 452 (4th Cir.2002); *Tinsley v. First Union Nat'l Bank,* 155 F.3d 435, 443 (4th Cir.1998). Pettiford has established that she engaged in protected activity and that the Defendants took an adverse employment action against her when they failed to make her a permanent employee at the end of her probationary period. Pettiford has also established a causal connection between her complaints and her termination events by showing that she was dismissed a little over one month after telling the Defendants she was engaged in discussions with the OAH, and only a couple of weeks after requesting a change in supervisors and complaining of racism to upper management. *Carter v. Ball,* 33 F.3d 450 (4th Cir.1994) (acknowledging that a five month period between the filing of the complaint and termination is close enough proximity to meet causal connection requirement); *Williams,* 871 F.2d at 457.

 The central question is whether Ms. Pettiford has come forward with sufficient, admissible evidence to create a reasonable inference that there was a causal connection between her protected activity and her discharge and/or her rejection for the Human Services Plan Evaluator IV position for which she had applied. Ms. Pettiford, as has already been mentioned, may prove a Title VII discrimination claim by either of two methods. If she has produced what has become referred to as "direct" evidence, i.e. evidence of conduct or statements that both reflect

directly the alleged discriminatory attitude and that bear directly on the contested employment decision and which, if believed, would require the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions, she may go to the jury without engaging the *McDonald Douglas* pretext paradigm and prevail if the jury should find that only one of the reasons playing an actual role in her discharge was that she had engaged in protected activity. *See Fuller v. Phipps,* 67 F.3d 1137, 1142–43 (4th Cir.1995). If her evidence is not sufficiently strong to be considered direct, she may prevail by utilizing the McDonald Douglas proof scheme and producing sufficient evidence to support a jury finding that the defendants' stated reason for her discharge or failure to hire/transfer was a pretext for the unlawful motive of retaliating against her because she had engaged in protected activity. *See Reeves,* 530 U.S. at 133, 120 S.Ct. at 2097, 147 L.Ed.2d at 105. To prevail in a pretext case, the jury would have to find that Ms. Pettiford would not have been discharged had it not been for engaging in protected activity even though there may have been several other factors contributing to the actual decision. *Fuller,* 67 F.3d at 1144. The judge, after reviewing the evidence, determines whether it has been of the character to be considered "direct" or whether the plaintiff must proceed under the pretext model. *Id.* at 1142, n. 2.

 In this case, the evidence which may be considered in determining the motion for summary judgment is limited to that adduced by the parties and further limited to that which has been properly authenticated pursuant to *Fed. R.Civ.P.* 56(e) and which would be admissible at trial under the rules of evidence, including hearsay.[7] Central to the

---

**7.** It should be noted that Pettiford produced evidence which cannot be considered in this

case on summary judgment because it has not

strength of Ms. Pettiford's retaliation claims is the uncontested evidence of two written directions to her in addenda to her Development Plan. In the first, dated July 26, 1999, she is instructed: "Dora will consistently refrain from stating to Carol that differences of opinion are due to cultural differences by October 1, 1999." Then, in a Second Addendum: "Effective immediately, Dora will consistently refrain from stating to Carol that differences of opinion are due to cultural differences. Failure to comply with the amended development plan will result in immediate dismissal." While the Defendants contend that the admonitions were given only for the purpose of directing Ms. Pettiford to listen without argument to Ms. Donin's instructions and feedback and to stop using "cultural differences" as an automatic shield to every suggestion offered, the Defendants' exhibits do not compel that interpretation and do not, therefore, foreclose a reasonable and competing interpretation that Ms. Pettiford was being admonished, at the peril of immediate termination, not to

been properly authenticated. Evidence submitted to the Court must be admissible at trial and therefore must be properly authenticated through a statement from a person or persons with personal knowledge of the origin. *Orsi*, 999 F.2d at 92. The documents submitted by Pettiford are e-mails exchanged between various supervisors concerning her complaint with the Office of Administrative hearings. These e-mails would provide further support that the legitimate reasons given for Pettiford's dismissal were a pretext for Defendants' retaliation against Pettiford once she filed her complaint with the Office of Administrative Hearing, but cannot be used because their authenticity has not been verified.

The e-mails were as follows: On June 1, 1999, Kornegay e-mailed Donin discussing misinformation a case manager received from Dora. The e-mail concluded: "Also, Dora stopped by about 2:30 today to say she had a meeting at the Albemarle building and would probably be back in about an hour. Let's guess what that may be about. Did we ship her work plan over to April to take a look at yet?" On June 2, 1999, Bickham e-mailed Larson instructions on how Pettiford should be further disciplined and ultimately terminated for any failure to comply with her Development Plan. This e-mail is authenticated and concludes: "Should Pettiford fail to meet the expectations of her Developmental plan she has the option to resign or you may suggest she resign in lieu of dismissal. However, the latter option allows her to file a grievance." On June 4, 1999, Bickham e-mailed Larson, copying Donin and stating that the purpose of a Development Plan is to provide a course of action to be taken to improve an employee's performance or con-

duct. He recommends Donin revise the plan to be more specific and to incorporate a time frame within which Pettiford should meet the goals. On August 9, 1999, Bickham notes to Donin in an e-mail that "Should Pettiford seek to challenge her developmental plan because she believes it is without merit and based on racial discrimination she may do so by filing a petition for a contested case hearing with the Office of Administrative Hearing. Carol, at this time Dora has not filed with OAH." The next day, Bickham e-mails Donin, Kornegay and Larson stating that they may alter the October 1, 1999 date by which Pettiford is to comply with their instructions if improvement is not forthcoming. Bickham states: "Dora should also be informed during each session that continued failure to meet the expectations of her development plan will result in separation. Should you decide to separate Dora, you should meet with her and convey unsatisfactory performance/unacceptable conduct issues coupled with an effective date of dismissal. You should then mail her a dismissal letter." Pettiford filed her charge with the Office of Administrative Hearings on August 26, 1999. On August 27, 1999, Larson writes to John Baggett and others, including Kornegay and Bickham, that "[t]hings are still happening with the CAP employee—Dora Pettiford. Phillip [Bickham] has been working with Cindy and Carol so he is very familiar with the case. Expect either more letters or phone calls." On September 17, 1999 Bickham e-mailed Donin about "what you can expect from Pettiford's OAH petition. The time line is unlimited since she filed within the prescribed time frame. What I meant by unlimited is that OAH will set a date for trial based on their court docket....."

speak of racial discrimination to her immediate supervisor.

Moreover, the plaintiff's evidence presently before the Court includes the temporal proximity of the discharge and failure to transfer/hire to the protected activities engaged in by Ms. Pettiford: at the longest, approximately two months for the oppositional activity of discussing "cultural differences" with her supervisor and less than one month from the time she informed Carol Donin that she had submitted a racial discrimination claim—participational activity—with the EEOC/Office of Administrative Hearings.

Based upon the evidence being considered for the purpose of deciding this summary judgment motion, the retaliation claims merit classification as direct evidence claims. Even if it had not qualified for direct evidence status, the evidence is more than sufficient to prove both causation and pretext.

A word of caution is appropriate, however. These comments and findings are based upon the evidence now before the Court. At trial, the evidence may raise additional inferences or may be presented in a way that weakens or even dispels the reasonableness of inferences. The trial judge will make a *de novo* decision regarding trial evidence and whether it merits classification as direct evidence, whether it should be presented to the jury under the pretext model, or whether it is sufficient to be presented to the jury at all.

Pettiford's complaint alleges that the Defendants retaliated against her for complaining of "race and sex discrimination." Pettiford did mention "race and/or sex discrimination" in her written request to Dr. Baggett for a transfer. She may have also complained of gender discrimination to the Office of Administrative Hearings. However, she has presented no argument or evidence to support her claim that the Defendants retaliated against her on the

basis of her gender claims. Therefore, Pettiford's claim of retaliation based on her allegations of gender discrimination must fail because she has not met this burden.

## VII.

■ Pettiford filed a state wrongful discharge claim under N.C. Gen.Stat. § 143–422.2. When analyzing claims under § 143–422.2, North Carolina courts have done so in the context of common law wrongful discharge claims or in connection with specific statutory remedies. *Smith v. First Union Nat'l Bank*, 202 F.3d 234, 247 (4th Cir.2000). Because claims under § 143–422.2 are analyzed under a Title VII framework when a cause of action is recognized, Pettiford would have to establish that "(1) she is a member of a protected class; (2) she was qualified for her job and her job performance was satisfactory; (3) she was fired; and (4) other employees who are not members of the protected class were retained under apparently similar circumstances." *Hughes v. Bedsole*, 48 F.3d 1376 (4th Cir.1995); *North Carolina Dep't of Correction v. Gibson*, 308 N.C. 131, 141, 301 S.E.2d 78, 85 (1983); *Brewer v. Cabarrus Plastics, Inc.*, 130 N.C.App. 681, 686, 504 S.E.2d 580, 584 (1998). For the reasons stated regarding her Title VII claim for discrimination, Ms. Pettiford cannot prevail under § 143–422.2.

## VIII.

■ Pettiford also filed a state claim for negligent infliction of emotional distress against Defendant DHHS for failing to take action to prevent or stop Carol Donin's harassing and abusive conduct towards her which, she claims, allowed others to retaliate against her. In North Carolina, a plaintiff must present evidence to create a reasonable inference that 1) the defendant negligently engaged in conduct;

2) it was reasonably foreseeable that such conduct would cause the plaintiff to suffer severe emotional distress, and 3) the conduct did in fact cause the plaintiff to suffer severe emotional distress. *Best v. Duke Univ.*, 337 N.C. 742, 448 S.E.2d 506 (1994). Pettiford has provided no evidence whatever that she did suffer severe emotional distress. In order to withstand summary judgment review, the party opposing the motion must provide evidence or point to evidence already in the record that would be sufficient to support a jury verdict in her favor. *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510,91 L.Ed.2d at 206. Ms. Pettiford has failed to meet this burden and, therefore, her claim for negligent infliction of emotional distress must also fail.

## IX.

In summary, Ms. Pettiford has presented sufficient evidence to create a genuine issue of material fact as to her claims that the Defendants retaliated against her for informally and formally complaining about racial discrimination. Defendants' motion for summary judgment is, therefore, DENIED as to the race-based retaliation claims. Summary judgment is GRANTED as to her state law claims and her claims for gender discrimination for unequal pay under Title VII and the Equal Pay Act, racial discrimination, disparate treatment, hostile work environment, retaliation on the basis of complaints about gender discrimination. These claims are all, therefore, DISMISSED WITH PREJUDICE.